UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- x

CASEY PHILLIP,

                          Plaintiff,

               -against-

THE CITY OF NEW YORK, NEW YORK CITY
DEPARTMENT OF EDUCATION, DAYSI GARCIA,
Principal of P65K, MARTHA RODRIGUEZ-TORRES,
Local Instructional Superintendent,

                      Defendants.

------------------------------------------------------------------------- x

**DEFENDANTS'
LOCAL RULE 56.1
STATEMENT OF
UNDISPUTED
<u>MATERIAL FACTS</u>**

09 Civ. 442 (ILG)(JO)

        Pursuant to Local Rule 56.1 of the Local Civil Rules of this Court, defendants City of New York, New York City Department of Education ("DOE"), and Daysi Garcia, by their attorney, MICHAEL A. CARDOZO, Corporation Counsel of the City of New York, submit the following statement of material facts as to which they contend that there is no genuine issue to be tried:

        1.      Plaintiff, a former teacher with the New York City Department of Education ("DOE"), brings this action alleging that he was discriminated against and suffered a hostile work environment based on his race, color and/or national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C § 1981, New York City Administrative Code §§ 8-502, and New York State Executive Law § 296.  <u>See</u> Exhibit "A."[1]  Plaintiff further contends that he was retaliated against when he complained of the alleged discrimination. <u>Id.</u>

---

[1] Unless otherwise indicated, all references to Exhibits are to the exhibits annexed to the Declaration of Jane E. Andersen ("Andersen Decl."), dated July 21, 2010.

2.      Plaintiff self-identifies as a black male of Caribbean descent.  <u>See</u> Exhibit "A" at ¶¶ 16, 21.

**A.      Background**

3.      Plaintiff began his employment with the DOE in January 2003 as a science teacher at P.S. 214, teaching Kindergarten through fifth grade.  <u>See</u> Exhibit "B" at 33:13-15; 46: 21-47:4.

4.      At the end of the 2002-2003 school year, plaintiff was excessed from P.S. 214 and assigned to work at P.S. 65.  <u>See</u> Exhibit "B" at 53:3-14.

5.      While at P.S. 65, Plaintiff taught the fifth grade for the 2003-2004, 2005-2006, and 2006-2007 school years, and the fourth grade for the 2004-2005 school year.  <u>Id.</u> at 53:15-19.

6.      Defendant Principal Daysi Garcia ("Principal Garcia") became the principal of P.S. 65 in August 2004. <u>See</u> Exhibit "C" at 28:25-29:9.

7.      Principal Garcia testified that her ethnic background is Hispanic of Caribbean, specifically Dominican, descent.  <u>Id.</u> at 38:2-8.

8.      Principal Garcia testified that when she came to the school she:

> had a very high expectation.  I wanted academic rigor.  I wanted Teachers to be engaged and the students to be engaged in learning throughout the day.  I wanted Teachers to meet with the Assistant principals and/or Coaches to move instructions in the same direction, and the tone of the building in the same direction where I wanted them to go.

<u>Id.</u> at 83:9-19.

9.      Plaintiff testified that when Principal Garcia first came to P.S. 65, they had a "principal/teacher relationship" but that the relationship changed around November of 2004. <u>See</u> Exhibit "B" at 59:2-16.

**B.      2004-2005 School Year**

10.      Plaintiff was formally observed by Principal Garcia two times during the 2004-2005 school year, once on October 21, 2004 and again on February 18, 2005.  Both times, plaintiff was issued an overall rating of satisfactory.  The written observations provided both "commendable aspects" of plaintiff's lesson and "recommendations for improvement."  <u>See</u> Exhibits "E" and "F."

11.      In the October 21, 2004 observation, Principal Garcia wrote that that plaintiff should "engage more students by having different students read a small piece;" use a "Venn diagram using a different reading selection;" and "have the students take the information off the Venn and apply it to a 4 square" in a specific manner.  <u>See</u> Exhibit "E."

12.      In the February 18, 2005 observation, Principal Garcia suggested that plaintiff put up "a current, interactive word wall" and keep "a log that describes students' learning behaviors." <u>See</u> Exhibit "F."

13.      Plaintiff was issued an overall rating of satisfactory for his 2004-2005 annual professional performance review and report.  <u>See</u> Exhibit "G." at Bates Stamp D00209-210.

**C.      2005-2006 School Year**

**(a) Teacher Observations and Evaluations**

14.      Plaintiff was formally observed by Assistant Principal Yvette Mendez ("AP Mendez") two times during the 2005-2006 school year, once on February 13, 2006, and again on April 11, 2006.  Both times, plaintiff was issued an overall rating of satisfactory.  The written observations provided both "supervisor's commendations" of plaintiff's lesson and "Supervisor's recommendations."  <u>See</u> Exhibits "H" and "I."

15.     In the February 13, 2006 observation, AP Mendez recommended that plaintiff "let one of the students be the recorder and that person can be the one to address the class explaining the steps they used to solve the problem." See Exhibit "H" at Bates Stamp D000205.

16.     In the April 11, 2006 observation, AP Mendez recommended that plaintiff involve his students in more hands on experiments. See Exhibit "I" at Bates Stamp D000201.

17.     Plaintiff was issued overall rating of satisfactory for his 2005-2006 annual professional performance review and report.  See Exhibit "J."

**(b) Letters**

18.     Plaintiff received a letter dated March 1, 2006 from Principal Garcia, which states in part, "I met with you and your union representative to discuss the poor quality of your lesson planning."   The letter further states that "Mrs. Mendez asked you for your lesson plan.   You handed in a one page lesson plan which did not include any of the essential components."   The letter also states that it is a teacher's obligation to "have five days worth of lesson plans as this will ensure effective instructional delivery as well as academic rigor."   See Exhibit "K."

**D.     2006-2007 School Year**

**(a) Feedback from Jaggon as Math Coach**

19.     Dionne Jaggon ("Jaggon") testified that she served as the school's math coach from September 2006 until March 2007.  In that capacity, Jaggon testified that she would observe teachers "when they taught their math lessons" for professional development purposes. See Exhibit "L" at 16: 18-23.

20.     Jaggon testified that she would visit each teacher's class at least once a week and visited plaintiff's class more than once a week.  Id. at 66: 9-13.

21. Jaggon testified that she would:

> look at how the teacher is teaching, I look to see the
> creation of the objective, if they are measurable,
> support them, they're coming up with a measurable
> objectives.  I look to see what manipulative, if any,
> that they are using in order to execute this particular
> mathematic lesson to make sure it's the best
> manipulative for the subject area and for the
> students.  I also try to help them decide on support
> materials to use to get the math strands across, there
> are five; there is geometry; there is statistical
> probability; there is problem solving; algebra and
> measurement.

Id. at 17:3-14.

22. Jaggon testified that her goal was to help teachers "before it got to the point of them being formally observed."  Id. at 33:12-14.

23. When asked how she viewed plaintiff's math teaching, Jaggon testified "It wasn't good."  Id. at 19:16-18.  When asked to explain what she meant by that, Jaggon testified:

> [Plaintiff] didn't model.  He didn't use experience
> charts.  His understanding of many of the math was
> just limited and it came across in his instruction.
> He was very teacher-centered in terms of his
> delivery, always speaking, and our students were
> very visual, so when it came time to work
> independently they weren't able to understand the
> task as it was delivered.  So that coupled with his
> unfamiliarity of the math it helped to cripple his
> lessons.

See Exhibit "L" at 19:19-20:6.

24. Jaggon testified that she discussed her concerns about plaintiff with Principal Garcia.  Id. at 20:17-19.

25. On October 18, 2006, Jaggon observed plaintiff's classroom.  Jaggon noted that plaintiff "conducted the lesson from the chair in front of the room" and that "there was no visible object or goal of the lesson."  Jaggon also noted that "the direct instruction lacked

modeling and questioning as a form of assessment."  Moreover, Jaggon stated that plaintiff has displays from a September lesson and that the "math portfolios appear incomplete and are missing the cover page." See Exhibit "N" at Bates Stamp D007820.

26.     On December 19, 2006, Jaggon once again observed plaintiff's classroom. Jaggon noted in part that during the lesson "there was not any teacher/student interaction." Moreover, Jaggon noted that plaintiff still has displays from a September lesson. See Exhibit "O" at Bates Stamp D007821.

27.     On January 16, 2007, Jaggon once again observed plaintiff's classroom. Jaggon's observation noted that she saw no "evidence of teacher modeling of the lesson on an experience chart or a measurable objective."  Moreover, Jaggon noted that plaintiff "should be instructing the students using the Kaplan books." Jaggon further noted that "there was not any teacher/student interaction" and that the "students worked independently as [plaintiff] monitored behavior from the front of [the] classroom."   Jaggon also noted that, plaintiff still has the displays from a September lesson up during the January observation. See Exhibit "P" at Bates Stamp D007822.

28.     In March 2007, Jaggon became an Assistant Principal at P.S. 65. See Exhibit "L" at 12: 3-7.

### (b) Teacher Observations and Evaluations

29.     Plaintiff was formally observed by AP Mendez on October 3, 2006 and on January 25, 2007.  See Exhibits "Q" and "R."

30.     While AP Mendez gave plaintiff an overall rating of satisfactory for the October 3, 2006 observation, AP Mendez provided recommendations for improvement stating in part "Some students were not able to complete the assignment.  Pair up students that are having difficulties with students that are more advance to assist each other."  The observation also states

"the comments that are attached to the work are not rubric based nor do they allow for students to grow in their writing."   The observation further states that "Comments like 'I think you learned something today' are inappropriate.   You need to present the comments in a positive manner.   Students need to know what their next steps are."   <u>See</u> Exhibit "Q"

31.     Principal Garcia testified that she spoke with AP Mendez about the October 3, 2006 observation, and asked her to "make sure that she worked with [plaintiff] on addressing these recommendations for improvement so that the next observation would be satisfactory" and testified that "Ms. Mendez never gave out any unsatisfactories." <u>See</u> Exhibit "D" at 24:15-22.

32.     Principal Garcia testified that she "would question that this is a satisfactory recommendation when it clearly states in the recommendation that students were not able to complete the assignment.   That his work was not current.   It didn't have comments on it." <u>See</u> Exhibit "D" at 24:2-8.

33.     Principal Garcia further testified that if a teacher writes "lessons for [their] students and they didn't meet it, that's not a satisfactory." <u>See</u> Exhibit "D" at 26: 22-24.

34.     In the January 25, 2007 observation, AP Mendez stated "the teacher/student created chart should be posted in your math center, so that students can refer to it when they have to solve similar math problems."   <u>See</u> Exhibit "R" at Bates Stamp D000172.

35.     Plaintiff was also formally observed by Principal Garcia.   By letter dated March 19, 2007, Principal Garcia commended plaintiff, noting that "students listened attentively as the teacher explained how the students were going to work independently and calculate the sale price for several items."   The evaluation also provides recommendations for improvements, stating in part "Mr. Phillip did not model any part of the two steps needed for the students to

determine the sale price.  Mr. Phillip did not review the vocabulary words in context, nor did these words become part of the interactive word wall."  The evaluation further states that "the students were unable to calculate sale prices, calculate discounts, or work cooperatively."  <u>See</u> Exhibit "S."

36.     On April 16, 2007, Plaintiff's classroom was observed by Local Instructional Superintendent Martha Rodriguez-Torres ("Superintendent Rodriguez-Torres"). By letter dated May 1, 2007, Superintendent Rodriguez-Torres wrote to plaintiff stating in part, "Your paucity of planning and your lack of skill specific aims translated into a series of fragmented exercises with no evidence of teaching on your part.  You were not following the literacy prototype for your school nor did you focus on the regional Skill of the Week."  <u>See</u> Exhibit "T."

37.     Superintendent Rodriguez-Torres testified that she looked at plaintiff's lesson plans for that day and that "He did not have plans for that day."  She testified that plaintiff "wrote reading, grammar, math.  The subjects but no substance to the plan."  <u>See</u> Exhibit "U" at 29:20-30:3.

38.     Superintendent Rodriguez-Torres also testified that during the 2006-2007 school year, the region had a prototype that each teacher would have to follow for every literacy lesson and every math lesson. She testified that a literacy lesson provides for "a read aloud, response to a read aloud by the children, guided reading, time for writing.  It involves teaching specific skills." <u>Id.</u> at 31:7-14.

39.     Superintendent Rodriguez-Torres further testified that when she looked at plaintiff's lesson plans, "there's no skills there and when you look at the aim of the lesson that he writes, there's no skill.  It's very generic." <u>Id.</u> at 31:14-17.

40.     Superintendent Rodriguez-Torres testified that plaintiff "did not teach a single thing," during the lesson she observed, and instead, she testified that "the purpose of that lesson was to have children waste good instructional time copying from the board so that they can edit." Id. at 24:5-9.

41.     When asked whether that was considered teaching, Superintendent Rodriguez-Torres testified "No, that's not teaching.  That's giving children an opportunity to do busy work.  It's not teaching."  Id. at 27:6-12.

**(c)  Counseling Memoranda and Letters to File**

42.     By memorandum dated October 24 2006, Principal Garcia wrote a counseling memo to plaintiff stating that "On October 24, 2006, I met with you and your union representative, Allan Weinstein to discuss your leaving students unsupervised." See Exhibit "W."

43.     By letters dated January 2, 2007, AP Mendez wrote to Plaintiff and fifth grade teachers, R.R, L.M, and S.N.,[2] regarding their incomplete use of the Kaplan ELA-Advantage Pacing Calendar.  See Exhibit "X."

44.     R.R. is identified as Hispanic, L.M as Black, and S.N. as Asian.  See Declaration of Robert Parlato ("Parlato Decl."), dated July 19, 2010 at ¶ 5.

45.     On January 8, 2007, plaintiff filed a grievance concerning the January 2, 2008 letter.  Plaintiff contended that other teachers were not given letters and that this "reinforces a pattern of disparate treatment on the part of the school administration and its designees."  See Exhibit "Y" at Bates Stamp D001801.

---

[2] Certain names of non-parties have been abbreviated to protect the confidentiality of these individuals.

46.     By letter dated January 10, 2007, AP Mendez denied the grievance.  Id. at Bates Stamp D001804.

47.     Plaintiff appealed this decision, and the grievance was denied by a representative of the Chancellor.  Id. at Bates Stamp D001799-1800.

48.     By letter dated March 8, 2007, plaintiff received a letter to his official file from Principal Garcia which states in part "I received letters from you dated February 28, 2007 and March 1, 2007 to which I take exception.   The tone of your letters were extremely unprofessional and has evidence of insubordinate behavior."  See Exhibit "Z."

49.     By memorandum, dated March 16, 2007, Principal Garcia wrote to plaintiff "you received a verbal and written directive to adhere to safety protocols stipulating that you dismiss your entire class at once and that you walk them to the gate and orderly dismiss them from the building."  See Exhibit "AA."

50.     By letter dated March 30, 2007, Principal Garcia wrote to plaintiff "In October and again in February, I met with you and your union representative to discuss the fact that you continuously send students out of your classroom unsupervised." The letter further states "I walked into your classroom and asked you why your student was outside alone.  You turned your back to me and ignored me."   The letter also states "you are not following appropriate protocol with respect to providing a safe and appropriate environment for students. Equally alarming, is the fact that your response indicated a lack of professional conduct." See Exhibit "BB."

51.     By letter dated April 13, 2007, Principal Garcia wrote to plaintiff regarding an incident which occurred on March 30, 2007, whereby Principal Garcia stated in part that plaintiff was in the main office when he "began screaming" and "continued yelling and

- 10 -

distracting the office staff for five minutes" and noted that plaintiff's "behavior was unprofessional." <u>See</u> Exhibit "CC."

52.     By letter dated April 19, 2007, Jaggon wrote to plaintiff stating that "it has been brought to my attention that you have approached several teachers in their classroom during their instructional time. . .requesting character support."   The letter further notes that "the teachers stated that [plaintiff's] request was badgering, harassing, and plaguing in nature." <u>See</u> Exhibit "DD."

53.     Jaggon testified that several teachers approached her and stated that plaintiff came to the door, telling them to come outside, and that they stated that "he was mean, he was loud." <u>See</u> Exhibit "L" at 101:17-102: 8.

54.     She also testified that she was told by the teachers that "He kept asking them, they were startled. They were surprised that he came to them because he never spoke to them." <u>Id.</u> at 106:12-16.

55.     On April 20, 2007, Jaggon wrote to plaintiff a letter with the subject line of "insubordination."   In the letter, Jaggon noted that on March 23, 2007, plaintiff "accused [Jaggon] of being on a 'witch hunt'." Jaggon also noted that on March 30, 2007, plaintiff's tone "was repugnant and disrespectful and unbecoming of a profession addressing his supervisor." Jaggon further noted that on April 11, 2007, "during the grade meeting, as I was presenting pertinent information regarding the expectations for the fifth grade teachers and students, you refused to join the table where the other fifth grade teachers and I were positioned." Jaggon also stated that "I asked you several times to please join us and you were unresponsive." <u>See</u> Exhibit "EE."

56.     Jaggon testified that she wrote the April 20, 2007, letter noting prior incidents because she "wanted to point out all of the things that he did in the past, so that he can see that he has been doing a lot of inappropriate things, not just that one day."  See Exhibit "M" at 61:2-19.

57.     By letter dated April 27, 2007, Jaggon wrote to plaintiff again.  The letter states that on April 26, 2007, Jaggon "went into your classroom upon your request and observed the students interacting with you." The letter continues to state "I encouraged you to make some worthwhile management changes in your classroom.  It is very clear that your self-defined stern management styles is not delivering the results you desire."  Jaggon also noted that "during our meeting you raised your voice at me and said, 'that won't work.'"  The letter further states "when you raise your voice over someone who is supporting you as well as your supervisor this constitutes insubordination.  You have to channel that energy in another way, since the results could never be positive."  See Exhibit "FF."

58.     Jaggon testified that:

> I told [plaintiff] how to speak to the kids, how to get the most out of them, how to, you know, watch his tone with the students; he would oftentimes yell at them.  He created that atmosphere of being very rigid in his classroom and because of that, he had a lot of behavior problems in his classroom.  I told him, you have to have the kids on your side.  You have to have a more pleasant discourse with them so that you are more approachable.

See Exhibit "L" at 67:17-68:2.

59.     By letter dated April 27, 2007, Jaggon wrote to plaintiff a letter concerning plaintiff's failure to timely submit an inspirational message, stating in part "This letter is to address your blatant disregard for adhering to supervisory directions."  See Exhibit "GG."

60.    By letter dated May 15, 2007, Principal Garcia wrote a letter to plaintiff which states "This letter is in regard to your neglect to inform our school of your absence on the date of May 14, 2007.  Because of your failure to show up for work yesterday, we were forced to divide 24 students between your colleagues."  See Exhibit "HH."

61.    By memorandum dated May 16, 2007, Jaggon wrote plaintiff a counseling memorandum regarding a "Balanced Literacy Walkthrough." The letter states "when I entered your classroom today, the students were working in their table arrangements.  The students were not grouped based on data."  The letter also states that during a read along plaintiff "did not post an objective, skill, or strategy so the read aloud was not purposeful."  The letter also noted that plaintiff conducted "think alouds regarding racism" and that plaintiff stated to the class "Michael and Emma are white names."  Jaggon stated that "these thoughts are not representative of best practices.  You cannot attribute names to a race of people."  See Exhibit "II."

62.    By letter dated June 1, 2007, Principal Garcia wrote a letter to plaintiff which states in part "In keeping with the Scope and Sequence for Social Studies for Grade 5. . .your students should be studying the Caribbean, and South America.  I am aware that in your request for copies today, you included a one-pager intended to persuade readers on taking a stance in relation to police brutality.  This is obviously not in line with the Social Studies Scope and Sequence."  The letter further states "please understand that students have impressionable minds.  In your teaching, you must remain objective at all times." See Exhibit "JJ."

63.    By letter dated June 27, 2007, Jaggon wrote to plaintiff a letter which states "You have not followed the portfolio regulations."  The letter  states that "A portfolio is a collection of student's best pieces and the student's evaluation of the strengths and weaknesses of the pieces" and that "Portfolios are. . . useful as a support to the new instructional approaches

that emphasize the student's role in constructing understanding and the teacher's role in promoting understanding." The letter also notes that "Administrative support was provided in the structure and use of portfolios" and that plaintiff is "officially in defiance of our portfolio regulations." See Exhibit "KK."

<b>(d) Lesson Plan Submissions</b>

64.    By letter dated May 4, 2007, Principal Garcia notified plaintiff that he is "currently at risk of receiving a year-end unsatisfactory rating." The letter further states that "In order to help support your delivery of effective lessons, you are required to submit complete lesson plans to me as of May 7, 2007 and every Monday thereafter." The letter further sets forth what the lesson plan must include. See Exhibit "MM."

65.    Principal Garcia testified that only a teacher in danger of receiving an end-of-the year unsatisfactory rating can be required to submit lesson plans, but all teachers were required to have lesson plans for five days available. See Exhibit "D" at 106: 8-21.

66.    By letter dated May 7, 2007, Principal Garcia provided feedback on plaintiff's lesson plans, stating in part, "it is imperative that your objective/aims are written in measureable terms," and states that his "lesson plans lack differentiation for your small group instruction." See Exhibit "MM."

67.    By letter dated May 15, 2007, Principal Garcia provided feedback on plaintiff's lesson plans for the week of May 14 through May 18. In part, the letter states "small group instruction has been outlined for May 14 only. Problems were delineated for each of the five groups without different levels of difficulty." The letter also notes that one of the activities planned by plaintiff "is grade appropriate for kindergarten and first grade. At the fifth grade level, activities should be rigorous, comprehensive and should follow the scope and sequence for grade five." See Exhibit "NN."

68.     By letter dated May 25, 2007, Principal Garcia provided feedback on plaintiff's lesson plans for the week of May 14 through May 18.  The letter further notes that "There have been several snapshots conducted in your classroom.  Several performance deficiencies that require corrective action have been noted."  <u>See</u> Exhibit "OO."

69.     By letter dated May 29, 2007, Principal Garcia provided feedback on plaintiff's lesson plans for the week of May 29 through June 1.  The letter states in part, "To the extent that your fifth-graders will be in middle school come next year, the number of words that students are directly taught must increase," and asks "what support material will you be using to ensure students are well-informed about the topic before they begin to draft?" The letter also states that "There are no Social Studies lessons outlined."  <u>See</u> Exhibit "PP."

70.     By letter dated June 4, 2007, Principal Garcia provided feedback on plaintiff's lesson plans for the week of June 4 through June 7.  The letter states in part, "I have noticed that week after week the groups do not change.  Are you assessing student learning." The letter also states "In maximizing instructional time, editing should not be taught aside and apart from Writing Workshop.  Instead, it must stem from authentic writing assignments that speak to students' progress." <u>See</u> Exhibit "QQ."

71.     By letter dated June 11, 2007, Principal Garcia provided feedback on plaintiff's lesson plans for the week of June 11 through June 15.  The letter states in part, "Lesson objectives are not aligned with independent and small group instruction."  The letter also notes "your lessons do not seem to be building upon previous lessons," and "your grammar work continues to be well under grade level."  The letter also notes that "you have been provided with written support and recommendations to address the shortcomings of your lesson plans on

the same day of submissions for over a month and to date you have failed to resubmit any lessons." <u>See</u> Exhibit "RR."

72.    By letter dated June 18, 2007, Principal Garcia provided feedback on plaintiff's lesson plans for the week of June 18 through June 22.  The letter states in part that "Your math instruction does not provide academic variations for differentiation of instruction," and that "Your objective is not written in measureable terms" and that "Your lesson fails to identify your small group's focus and the novel or book title that you are using to identify similes and metaphors."  <u>See</u> Exhibit "SS."

### (e)  Unsatisfactory Rating

73.    Plaintiff was issued an overall rating of unsatisfactory for his 2006-2007 annual professional performance review and report.  Bates 151-152.  <u>See</u> Exhibit "TT."

## E.    Disciplinary Charges and Subsequent Events

### (a)  Disciplinary Charges

74.    After the 2006-2007 school year, disciplinary charges were preferred against petitioner pursuant to Education Law § 3020-a for insubordination and incompetence.  Effective October 26, 2007, petitioner was suspended with pay due to the nature of the charges against him. <u>See</u> Exhibit "UU."

75.    Pursuant to Education Law §3020-a, hearing was conducted before an impartial hearing officer, Randi E. Lowitt ("Hearing Officer Lowitt").  <u>See</u> Exhibit "VV."

76.    Before a decision was issued by Hearing Officer Lowitt, Petitioner was notified by letter, dated October 7, 2008, that his visa has been revoked since he had been suspended since October 27, 2007. <u>See</u> Exhibit "WW."  Without a visa, plaintiff was ineligible to work in the United States and his employment was terminated. <u>See</u> Exhibit "XX."

77.     Thereafter, on November 17, 2008, Hearing Officer Lowitt rendered an Opinion and Ruling finding that he no longer had jurisdiction over the matter and stated that "Mr. Phillip was discharged for reasons external to the 3020-a process, because of the loss of his visa and the loss of his ability to work in this country." See Exhibit "VV" at D000078.

### (b) Article 78 Proceeding Challenging Termination

78.     Petitioner brought an Article 78 petition challenging his termination and the revocation of his visa.  By decision dated October 29, 2009, plaintiff's petition was granted to the extent that defendant DOE was directed to pay petitioner back pay from the date of his termination until the January 31, 2009—which is the date that his visa was set to expire on its own.  See Exhibit "XX."

## F.     Plaintiff's Complaints of Discrimination And Retaliation To The DOE.

79.     On December 27, 2006 plaintiff filed a Complaint of Alleged Discrimination in violation of Chancellor's Regulation A-830 with the DOE's Office of Equal Opportunity ("OEO"). See Exhibit "YY."

80.     In this complaint, plaintiff alleged that Principal Garcia had discriminated against him on the basis of color, ethnicity/national origin, race, and union activity.  Id.

81.     Plaintiff described incidents that allegedly occurred between November 2004 and December 2006.  These alleged incidents included:  (1) Principal Garcia's position during a classroom observation; (2) the handling of a student complaint; (3) the time plaintiff was given to prepare for a classroom observation; (4) a comment that Principal Garcia made; (5) intimidation by Principal Garcia; (6) assignments plaintiff was given to fulfill his internship; (7) a meeting in Principal Garcia's office concerning a comment that plaintiff made to another staff member; (8) a meeting with Principal Garcia regarding student scores on state examinations; (9) the students assigned to plaintiff's class; (10) a hand gesture Principal Garcia used that plaintiff

found "demeaning;" (11) a gesture Principal Garcia made while plaintiff led students in singing

the national anthem; (12) Principal Garcia not seeing plaintiff's students perform on cultural day;

(13) plaintiff being accused of leaving students unsupervised; (14) a reading of <u>The Cay</u> on

Election Day; (15) documents removed from plaintiff's personnel file and shredded; (16) the

lunch schedules being manipulated in a "segregated manner;" (17) a staff luncheon about which

plaintiff was not informed; and (18) "post-its" being required on displayed student work.  <u>Id.</u> at

Bates Stamp D001294-1304.

82. In a report dated February 20, 2007, OEO found no violation of

Chancellor's Regulation A-830 because "the complainant presented no credible evidence that he

was discriminated against because of his race;" Principal Garcia "provided credible responses to

each of the allegations;" Jaggon, who is African American, "overheard the complainant and Mrs.

Mohammed plotting ways to 'set up'" Principal Garcia; "several staff confirmed that the

invitation to the staff luncheon was posted and each teacher was notified;" and Principal Garcia

"stated since becoming principal in September 2004, she has hired three African American

Assistant Principals, one math coach, a science cluster teacher, a fourth grade teacher and a

paraprofessional."  <u>See</u> Exhibit "ZZ" at Bates Stamp D001238.

83. By letter dated February 22, 2007, DOE notified plaintiff of OEO's

determination.  <u>See</u> Exhibit "AAA."

84. Plaintiff then appealed OEO's determination.  <u>See</u> Exhibit "BBB."

85. DOE denied plaintiff's appeal in a decision dated May 4, 2007.  <u>Id.</u> at

Bates Stamp D001224.

86.     The decision states that a review of OEO's findings revealed "a reasonable basis for its determination that there was no evidence of unlawful discrimination or harassment." Id.

87.     The decision further noted that witness statements did not substantiate any of plaintiff's allegations, and that "one statement from an African-American teacher implied that [plaintiff] was working with other teachers to 'set up' [Principal Garcia] for removal from her position." Id.

88.     On April 18, 2007, plaintiff filed a second Complaint of Alleged Discrimination in violation of Chancellor's Regulation A-830 with OEO.  See Exhibit "CCC."

89.     Plaintiff alleged that "[s]ince the conclusion of my OEO Case, numerous unfair and discriminatory acts have been perpetrated against me at my work place by the principal, Daysi Garcia."  Id. at Bates Stamp D001468.

90.     Plaintiff detailed the alleged actions taken against him, which included: (1) receiving letters to his personnel file; (2) denial of his request to have an upcoming observation videotaped; (3) receiving an unsatisfactory rating for a classroom observation; and (4) being "summoned" to the principal's office.  Id. at Bates Stamp D001468-70.

91.     In a report dated May 30, 2007, OEO found that the evidence did not substantiate plaintiff's allegations that Principal Garcia retaliated against him for having filed a prior complaint with OEO.  See Exhibit "DDD."

92.     The report states that OEO reached this conclusion based on the totality of evidence presented, including a finding that plaintiff's allegation that he was treated differently from others whom he alleged behaved in an unprofessional manner was not true.  Id. at Bates Stamp D001321.

93.     By letter dated June 1, 2007, DOE notified plaintiff of OEO's determination.  See Exhibit "EEE."

94.     In a memorandum to Chancellor Joel Klein dated June 1, 2007, plaintiff alleged that: (1) he was a "victim of harassment and character assassination by Principal Daysi Garcia;" (2) he had two interactions on June 1, 2007 with a colleague Mr. Caulfield, during which Mr. Caulfield accused plaintiff of reporting him to the DOE's Office of Special Investigations ("OSI"); (3) when he sought Principal Garcia's assistance in the matter, she told him, "I don't want to say anything to you without your union rep" and slammed the door in his face; and (4) Principal Garcia did not intervene in the incident.  See Exhibit "FFF" at Bates Stamp D001749-1750.

95.     The Chancellor's Office of Special Investigations referred the matter to OSI, which then forwarded the case to Regional Superintendent Cashin.  Id. at Bates Stamp D01741.

96.     Following an investigation into plaintiff's allegations, Superintendent Rodriguez-Torres found them all to be unfounded.  Id. at Bates Stamp D001736-38.

97.     In addition to his written complaints, plaintiff alleges that on or about June 8, 2007, he and other teachers met with Superintendent Rodriguez-Torres and Regional Superintendent Kathleen Cashin and orally complained about Principal Garcia's discriminatory treatment of them.  See Exhibit "A" at ¶ 45.

98.     Superintendent Rodriguez-Torres testified that she recalls attending a meeting where plaintiff and other teachers complained that "they felt that [Principal Garcia] was not being fair."  See Exhibit "U" at 41: 3-24.

**G.      Plaintiff's Complaint Of Discrimination To The United States Equal Employment Opportunity Commission.**

99.      On January 4, 2007, plaintiff completed and submitted an Intake Questionnaire to the United States Equal Employment Opportunity Commission ("EEOC").  See Exhibit "GGG."

100.     On February 5, 2007, plaintiff filed a Charge of Discrimination with the EEOC.  See Exhibit "HHH."

101.     Plaintiff's Charge alleged discrimination based on race, color, and national origin and complained of many of the same events that were the subject of his OEO complaints. Id.

102.     Plaintiff submitted an amended charge to the EEOC on or about October 22, 2007.  See Exhibit "III."

103.     On or about December 18, 2008, the EEOC sent plaintiff a letter advising him of his right to sue within ninety days.  See Exhibit "JJJ."

**H.      Plaintiff Pursues His Claims In Federal Court.**

104.     On February 3, 2009, plaintiff filed the complaint in this action.  See Docket Entry No. 1 in the instant matter.

105.     On October 10, 2009, plaintiff filed an amended complaint.  See Docket Entry No. 13 in the instant matter.

**(a) Plaintiff's Allegations of Actions That Occurred in 2004-2005**

106.     In his amended complaint, plaintiff makes allegations concerning a classroom observation in the Fall of 2004 during which Principal Garcia "positioned her chair so that she had her back turned to Plaintiff during the entire observation."  See Exhibit "A" at ¶ 17.

107.    Principal Garcia testified at her deposition that "[w]hen I go in to do an observation, my practice is to watch the children."  See Exhibit "C" at 119:4-13.

108.    When asked where she sits in relation to the teacher, Principal Garcia testified:  "Never in relation to the Teacher . . . I can't position myself to sit next or in front of the Teacher, because the Teacher is always going to move.  I need to face the children."  Id. at 120:11-21.

109.    At his deposition, plaintiff testified:  "I recall [Principal Garcia] telling the students that she wanted to see the expressions on their faces, not their teachers."  See Exhibit "B" at 60:5-18.

110.    As to what rating plaintiff received following this November 2004 observation, plaintiff testified, "[i]t was a satisfactory rating."  Id. at 62:14-18.

111.    Also in the Fall of 2004, plaintiff alleges that Principal Garcia "did not follow protocol in handling a student/parent complaint against Plaintiff . . . [Principal] Garcia had not called Plaintiff into the office to respond to this very serious allegation while the parent was there and Plaintiff only found out about this allegation soon after it was made by happenstance."  See Exhibit "A" at 18.

112.    About the "protocol" for a student complaint against a teacher, plaintiff testified:  "It is something that we are taught in school that as a teacher that is something that happens, if there is a complaint, it is the principal's right to call you and to settle the matter."  See Exhibit "B" at 70:11-17.

113.    When asked whether the DOE has a written protocol on the matter, plaintiff testified:  "I couldn't say that there is because I don't think I've ever seen one."  Id. at 70:18-21.

114.    Principal Garcia testified that if a parent comes to her about something the parent thinks a teacher is not doing right in the classroom, she would "listen to the parent" and "take down the information.  I would assure him or her that I would get back to him or her.  I would check with the Teacher.  Then I would speak to the Assistant Principal of the grade or the Coach or depending on what needed to be done.  Then get back to the parent."  See Exhibit "C" at 128:2-20.

115.    As for other incidents prior to June 2005 that led plaintiff to believe he was being treated differently because of his race and national origin, plaintiff testified that after a union meeting in March 2005 at which he inquired as to his rights to know about "a child being brought to [his] class who apparently has issues, behavioral problems," Principal Garcia told him, "I heard what you said.  If you need – if you want my help, you have to support me."  See Exhibit "B" at  74:7-75:2.

116.    On June 28, 2005, the last day of the 2004-2005 school year, plaintiff alleges that Principal Garcia made the following comment to him: "When you return in September, I'll be a slave driver."  See Exhibit "A" at ¶ 20.

**(b) Plaintiff's Allegations of Actions That Occurred in 2005-2006**

117.    In his amended complaint, plaintiff alleges that in October or November 2005, Principal Garcia gave plaintiff and Lucienne Mohammed "only a weekend's notice to prepare a lesson plan for a pre-observation meeting" and were told to adhere to a ten-page document in doing so.  See Exhibit "A" at ¶ 21.

118.    At her deposition, Principal Garcia stated the following about the amount of time given to teachers to prepare for a pre-observation:  "My school's policy, I want five days worth of lessons, so you are already planned for the next five days in my school, so if I meet with

you, and I say that I am coming in tomorrow you already have a lesson plan."  See Exhibit "C" at 136:4-18.

119.    Principal Garcia went on to state that it is her schedule that determines the amount of notice given to teachers about a pre-observation meeting.  See Exhibit "C" at 137:10-13.

120.    Plaintiff alleges that he experienced discrimination with regard to an internship in connection with his course of study to be a school administrator.  Plaintiff contends that Principal Garcia "tried to prevent plaintiff from fulfilling the requirements for the internship" and gave him "duties that had nothing to do with the requirements of his internship," such as breakfast duty, yard duty, lunch duty, and bus duty.  See Exhibit "A" at ¶ 22.

121.    Plaintiff further alleges that Principal Garcia gave him "the lowest or almost lowest possible rating" for the internship.  Id. at ¶ 23.

122.    At his deposition, however, plaintiff admitted that Principal Garcia did not evaluate him with regard to his internship and that AP Mendez, who did evaluate him, gave him a rating of "satisfactory."  See Exhibit "B" at  94:23-95:18.

123.    Principal Garcia testified that she and plaintiff discussed gaining experience in administration, which can include, "arriving to the school and seeing what the schedule for the day is going to be . . . It includes taking children off the bus if they come on the bus.  It includes breakfast, to making sure the children have one [sic].  It includes greeting when they come into the school.  It includes observation.  It includes planning with Teachers.  It includes lunch duty and it includes budget, professional developing, after school programs, and Saturday programs, meetings with parents, meetings with Teachers."  See Exhibit "C" at 141:12-142:18.

124.    Principal Garcia further stated that there were concerns regarding plaintiff's availability and the amount of time he could give to the internship.  Id. at 144:21-145:4.

125.    Regarding plaintiff's availability, Principal Garcia testified that:  "He could not stay after school.  He had to leave.  He could not come or the times that he could come in there wasn't children to work with or Teachers or staff.  He would not come in on weekends on the Saturday program, so it was basically very limited to the time frame.  The morning duty or lunch duty or the after school.  Whatever time he could stay till."  Id. at 145:10-22.

126.    In sum, Principal Garcia explained:  "It was the only time that he was available was a brief time in the morning, his lunchtime, which he was willing to give and a brief time in the afternoon."  Id. at 148:3-16.

127.    In addition to plaintiff, other P.S. 65 staff members were engaged in administrative internships at the time.  See Exhibits "KKK" and Exhibit "C" at 143:7-16.

128.    Vanessa Rosa explained in a written memorandum that the duties for her administrative internship included "daily scheduling, morning line up, lunch duty, as well as coordination and supervision of after-school and Saturday school programs."   See Exhibit "KKK" at Bates Stamp D000188.

129.    As to plaintiff's duties, Ms. Rosa wrote: "Due to his own personal schedule he was unable to assist in the daily scheduling, which took place at 7:00 A.M. every morning.  He was also unable to participate in the supervision of after-school programs, which took place Tuesday – Thursday from 3:00 P.M. – 5:00 P.M. as well as the Saturday program which took place on Saturdays from 9:00 A.M. – 1:00 P.M.  On the few occasions that I was

unable to fulfill one of my internship duties and requested Mr. Phillip cover for me, he was unavailable to do so." Id.

130.    Wendy Glash, a fourth grade teacher at P.S. 65, wrote in a statement that as part of her internship, she assisted with the budget, "completing the work either before or after school, on my own time, often working until 11:00PM." Ms. Glash also stated that she attended training sessions after school at another location, trained as a test coordinator, and assisted with third grade morning line-up and lunch duty. Id. at Bates Stamp D000190.

131.    Regarding plaintiff's knowledge of her duties, Ms. Glash stated that their "paths did not cross" during the time she completed her internship, nor did she ever have a conversation with plaintiff about her internship duties. Id.

132.    When asked at his deposition about what duties Ms. Grandner, Ms. Glash, and Ms. Rosa were performing for their internships, plaintiff admitted: "I don't think I specifically spoke to them about what they were doing, but I knew what they were doing." See Exhibit "B" at 88:1-7.

133.    Plaintiff testified that he completed the requirements of his internship in early 2007. Id. at 92:23-93:8.

134.    Also concerning the 2005-2006 school year, plaintiff alleges that on March 2, 2006, and "several times thereafter," Principal Garcia beckoned him with a demeaning hand gesture but did not use this gesture with his "non-Black, non-Caribbean colleagues." See Exhibit "A" at ¶ 24.

135.    At his deposition, plaintiff testified that defendant Garcia at times used her index and middle fingers together to communicate with him, and that each time defendant Garcia used this gesture, plaintiff was in his classroom. See Exhibit "B" at 176:1-177:17, 178:22-179:1.

136.   When asked at his deposition whether Principal Garcia ever used her fingers to call another teacher out of the classroom, plaintiff testified, "[t]hat I don't know" and that he did not ask other teachers.  See Exhibit "B" at   178:1-6.

### (c) Plaintiff's Allegations of Actions That Occurred in 2006-2007

137.   Plaintiff alleges that in the 2006-2007 school year, Principal Garcia assigned him a class of 25 "at-risk" students and "failed and refused to assign him an assistant," while a White teacher had a smaller class and was assigned an assistant. See Exhibit "A" at ¶ 25.

138.   At his deposition, plaintiff testified that he was concerned with taking one of his students for swimming lessons due to the student's behavior, and that the student was required to go swimming "to make [his] life miserable."  See Exhibit "B" at   153:13-154:23.

139.   Principal Garcia testified that plaintiff had a class with "a couple" of children who had Individualized Education Plans ("IEPs"), and that before the school year begins, the school does its best to distribute the students with IEPs equally among the different classrooms so that each teacher has the same amount of high-, middle-, and low-level functioning students.  See Exhibit "C" at 161:25-163:14.

140.   With respect to "assistants" in the classroom, Principal Garcia testified that there may be a paraprofessional in a classroom if a child's IEP requires that the child have one-on-one" paraprofessional assistance or a classroom may have a mandated assistant if the number of students in the class exceeds the capacity of a full class.  Principal Garcia explained that in the fourth or fifth grade, a full class is 28 to 32 students, so if an additional 15 or 20 students were added to the class, then she would have to assign an assistant.  Id. at 165:10-166:6.

141.   Principal Garcia further testified that plaintiff had asked for help, and that she in turn asked the guidance counselor to help plaintiff with the "behavior concerns he might

have," she asked the coach to provide whatever she thought he might need, and that the Assistant Principal was also directed to help him.  Id. at 166:24-167:16.

142.    At his deposition, plaintiff alleged that he was retaliated against by being "hounded" to place "post-its" on student work that he displayed on bulletin boards.  See Exhibit "B" at 159:11-160:3.

143.    Plaintiff testified that he did not ask other teachers whether they were directed to make similar postings of student work but that directives were given at staff meetings and were "meant for all staff members."  Id.  at 160:23-161:3.

144.    Plaintiff contends that in or around October 2006, Principal Garcia "falsely alleged" that plaintiff left his students unsupervised and that she did not reprimand non-Black, non-Caribbean teachers who had left their students unsupervised.  See Exhibit "A" at ¶ 26; see also Paragraphs 42, 50, supra.

145.    However, on June 9, 2006, Principal Garcia wrote a letter to Y.F. concerning an incident where she left her students with a dance "resident."  The letter explained that residents are not certified teachers, and thus students should not be left alone with them.  See Exhibit "LLL."

146.    Y.F is identified as Hispanic.  See Parlato Decl. at ¶ 5.

147.    Plaintiff makes allegations concerning a professional development session conducted on November 7, 2006, during which he was "embarrassed and humiliated" by being asked to read the part of the "Negro" in the book The Cay.  See Exhibit "A" at ¶¶ 27, 28.

148.    At her deposition, Principal Garcia testified that it is the region that chose The Cay for the professional development session and that she did not know what book was going to be read.  See Exhibit "C" at 171:25-172:20.

149.    Jaggon also testified at her deposition that Region 5 chose <u>The Cay</u> for the professional development session.  <u>See</u> Exhibit "M" at 86:8-23.

150.    A chart entitled "Region 5 Interdisciplinary Novel Study List" includes The Cay as among those novels selected for the fifth grade.  <u>See</u> Exhibit "MMM."

151.    Also with regard to classroom books, plaintiff alleges that he was the only teacher required to read <u>Roll of Thunder, Hear My Cry</u>, "which used the word 'nigger' repeatedly."  <u>See</u> Exhibit "A" at ¶ 29.

152.    As to who determines what books teachers will use in their classes, Principal Garcia testified that, at the time, it was the region, and that the region sent the books. <u>See</u> Exhibit "C" at 180:15-20.

153.    When asked at her deposition whether she suggested to teachers what particular books they could use to teach, Principal Garcia answered, "No."  <u>Id.</u> at 182:19-22.

154.    At her deposition, Superintendent Rodriguez-Torres testified that teachers were permitted to select from the approved books those titles that they would use to instruct their students.  <u>See</u> Exhibit "V" at 11:13-16.

155.    When asked whether there were circumstances when the principal would direct all teachers to use a particular book for instruction, Superintendent Rodriguez-Torres answered:  "Not that I am aware of."  <u>Id.</u> at 11:17-24.

156.    When asked to explain under what circumstances it would be appropriate to use a book that contained the word, "nigger," Superintendent Rodriguez-Torres explained: "We don't ban books.  And books that are approved have been selected by the Department of Ed. as appropriate for instruction, and it's how you use the book that matters, and the discussions that you have with students around the book."  <u>Id.</u> at 10:18-11:12.

157.    Plaintiff alleges that during the 2006-2007 school year, Principal Garcia "implemented a segregation policy" with regard to lunch scheduling such that "Plaintiff and the only other Black and Caribbean teacher teaching fifth grade were scheduled to have lunch during a separate time period from their two colleagues, one of whom was Hispanic and the other of whom was Guyanese/Indian."  See Exhibit "A" at ¶ 30.

158.    Principal Garcia testified that she changed the scheduling of lunch periods over the summer "[b]ased on the number of the students that can be in the cafeteria at the same time."  See Exhibit "C" at 184:14-185:3.

159.    As to whether there would be a reason for third graders and fifth graders to have lunch at the same time, Principal Garcia testified:  "It is all based on the number of children.  If I can only have 175 seated at the same time, I have to try to find 175 that period."  Id. at 185:12-21.

160.    When testifying about the lunch schedule, Plaintiff admitted that "[t]he reason the principal gave for the change in the schedule was that she didn't want too many students in the lunchroom at the same time."  See Exhibit "B" at  185:7-186:4.

161.    Plaintiff alleges that on December 22, 2006, there was a staff luncheon at P.S. 65 and that "the dark-skinned teachers in the fifth grade were excluded."  See Exhibit "A" at ¶ 31.

162.    At her deposition, Jaggon testified that notice of the luncheon was given to staff in two ways.  First, a flyer was placed in staff mailboxes, and, second, a notice was published in the weekly professional development bulletin. See Exhibit "M" at 83:16-23.

163.    Jaggon further testified that she prepared the notice in the weekly professional development bulletin and that she gave the bulletin to everyone, including Mr. Phillip and Ms. Mohammed.  Id. at 84:15-85:16.

164.    A written statement from Viviann Rodriguez indicates that she created a flyer for the school's holiday luncheon to occur on December 22, 2006.  Ms. Rodriguez stated that the flyer was placed in each staff member's mailbox and displayed in the Main Office and the Teacher's Lounge.  See Exhibit "NNN."

165.    Plaintiff testified at his deposition that he does not think he asked anybody why he was not invited to the luncheon and that he did not talk to Principal Garcia about the luncheon.  See Exhibit "B" at  111:9-11, 112:7-10.

166.    Plaintiff next alleges that while he was leading students in a singing of the national anthem, Principal Garcia "proceeded to insert her index finger into her open mouth." Plaintiff further alleges that Principal Garcia "never engaged in such an act of unprofessionalism while non-Black, non-Caribbean teachers were leading the national anthem."  See Exhibit "A" at ¶ 32.

167.    As to why plaintiff believes that Principal Garcia was referring to his singing when she allegedly made this gesture, plaintiff testified that "there was nothing else happening at the time" but went on to state that the students and other teachers were singing as well.  See Exhibit "B" at  189:14-23.

168.    Plaintiff testified that he believed the gesture was directed at him because "I was the one who stood out.  I was the one who was singing the loudest.  And I think that's the reason for it.  I'm the one who she could hear."  Id. at 189:24-190:4.

169.    When asked whether anyone else saw Principal Garcia make this gesture, plaintiff testified, "I couldn't be certain of that," and that, "I don't think anybody else said that there were – that they saw that particular gesture." Id. at 190:5-11.

170.    Plaintiff's next allegation concerns a cultural day for the fifth grade classes.  Plaintiff contends that when his students performed, Principal Garcia and other P.S. 65 staff walked out.  See Exhibit "A" at ¶ 33.

171.    At his deposition, plaintiff testified that Ms. Mohammed's students performed that day, that Ms. Mohammed is black, and that, to the best of plaintiff's knowledge, Principal Garcia saw Ms. Mohammed's class perform.  See Exhibit "B" at  174:7-12.

172.    Plaintiff further testified that he did not believe Principal Garcia left the performance because she had something to take care of, and when asked why he did not believe this, plaintiff stated:  "Just my personal feeling based, again, on what had transpired at that school with myself and the principal.  And I felt as if it was another attempt to be disrespectful." Id. at 174:13-23.

173.    Plaintiff alleges that on or about December 14, 2006, he requested copies of documents from his personnel file and that he was told that some of the documents, including documents related to his internship and letters of recommendation and commendation, were shredded by Principal Garcia.  See Exhibit "A" at ¶ 34.

174.    When asked at her deposition about documents relating to plaintiff's internship and a letter of recommendation, Principal Garcia testified:  "That would not be part of a personnel file, so I don't know if that was – if he received them.  I gave him the letter of recommendation for his internship, but that is not something that would go into your personnel file."  See Exhibit "C" at 189:7-18.

175.    Plaintiff also alleges that Principal Garcia "used derogatory terms" to refer to him.  See Exhibit "A" at ¶ 35.

176.    At his deposition, plaintiff testified that the derogatory terms were letters to file where he was "termed as loud, aggressive, threatening, scary."  See Exhibit "B" at 190:12-24.

177.    Plaintiff alleges that in order to make it seem as though the unsatisfactory classroom observation that he received on March 19, 2007 was not his first unsatisfactory rating, a DOE staff attorney "authored a document that claimed that Plaintiff had been 'u' rated at P721Q while Plaintiff was a teacher there.  However, Plaintiff had never even taught at P721Q and never received a 'u' rating before."  See Exhibit "A" at ¶ 40.

178.    In a letter dated May 7, 2007 enclosing the Chancellor's decision on his OEO appeal, DOE Staff Attorney Katherine Rodi indicated that plaintiff received an unsatisfactory annual rating at P721Q.  See Exhibit "OOO" at Bates Stamp D005796.

179.    Plaintiff sent a letter to Staff Attorney Rodi requesting that she re-send her May 7 letter with the correct information.  Id. at Bates Stamp D005795.

180.    Staff Attorney Rodi sent plaintiff a revised letter dated October 25, 2007, in which she omitted mention of an unsatisfactory rating or P721Q.  Id. at Bates Stamp D005798.

181.    Plaintiff alleges that he was further discriminated and retaliated against when he was referred for a psychiatric evaluation.  See Exhibit "A" at ¶ 42.

182.    By letter dated April 20, 2007, plaintiff was directed pursuant to New York Education Law § 2568 to report for a medical examination.  See Exhibit "PPP" at Bates Stamp D002846.

183.    Principal Garcia documented the reasons for the medical examination, which included plaintiff's "erratic, threatening, and adverse reactions to instances where he has been asked to follow formal supervisory/supervisee protocol," "unpredictable and explosive behaviors toward his colleagues," and "unpredictable and explosive behaviors when working with students."  Id. at Bates Stamp D002849-50.

184.    Superintendent Rodriguez-Torres sent the request for a medical examination to DOE's Medical Bureau by letter dated April 13, 2007.  Id. at Bates Stamp D002856-57.

185.    Documentation of plaintiff's medical examination on May 9, 2007 indicates that plaintiff could continue in service pending receipt and review of requested medical documentation.  Id. at Bates Stamp D002847.

186.    When asked at this deposition why plaintiff believed he was requested to report for a medical evaluation, plaintiff testified:   "Personally, I think it was intended to humiliate me.  I think it was another avenue to find a way to get rid of me."  See Exhibit "B" at 159:2-6.

187.    Plaintiff testified that he based this belief "on all the evidence that I've given in terms of my interaction with the principal and things that have transpired at that school."  Id. at 159:7-10.

188.    Finally, plaintiff alleges that between 2004 and 2007, Principal Garcia "removed, did not rehire, caused the removal, or caused not to be rehired ten staff members of color."  See Exhibit "A" at ¶ 47.

189.    Plaintiff testified that he believes Principal Garcia forced AP Mendez to retire because "she too had letters being put in her file very often."  See Exhibit "B" at 199:13-21.

190.   AP Mendez is identified as Hispanic.  <u>See</u> Parlato Decl. at ¶ 5.

191.   At her deposition, Principal Garcia testified that she hired Jaggon and Assistant Principal Leatrice Johnson ("AP Johnson").  <u>See</u> Exhibit "C" at 81:23-82:8.

192.   Both Jaggon and AP Johnson are identified as Black.  <u>See</u> Parlato Decl. at ¶ 5.

Dated:   New York, New York
         June 21, 2010

MICHAEL A. CARDOZO
Corporation Counsel of the
   City of New York
Attorney for Defendants
100 Church Street, Rm. 2-315
New York, New York 10007
(212) 766-0870
janderse@law.nyc.gov

By:  _____/s/_____

     Jane E. Andersen
     Assistant Corporation Counsel

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------- x

CASEY PHILLIP,

                                            Plaintiff,

                                                           09 Civ. 442 (ILG)(JO)

        -against-

THE CITY OF NEW YORK, NEW YORK CITY
DEPARTMENT OF EDUCATION, DAYSI GARCIA,
Principal of P65K, MARTHA RODRIGUEZ-TORRES,
Local Instructional Superintendent,

                                       Defendants.

---------------------------------------------------------------------- x


        Jane E. Andersen, declares, pursuant to 28 U.S.C. § 1746 and subject to the penalties of perjury, that on July 21, 2010, she caused a true and correct copy of the foregoing LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS, dated July 21, 2010, to be served upon:

                            Anthony C. Ofodile
                            Ofodile & Associates, P.C.
                            498 Atlantic Avenue
                            Brooklyn, New York  11217

by regular mail, directed to same at the above address, and by ECF.

Dated:          New York, New York
               July 21, 2010


                            _____/s/_____
                            Jane E. Andersen
                            Assistant Corporation Counsel
                            100 Church Street, Room 2-315
                            New York, New York 10007
                            T:  (212) 788-0870
                            janderse@law.nyc.gov

09 Civ. 442(ILG)(JO)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CASEY PHILLIP,

                                                             Plaintiff,

            -against-

THE CITY OF NEW YORK, NEW YORK CITY
DEPARTMENT OF EDUCATION, DAYSI GARCIA,
Principal of P65K, MARTHA RODRIGUEZ-TORRES, Local
Instructional Superintendent,

                                                             Defendants.

## DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS

***MICHAEL A. CARDOZO***
*Corporation Counsel of the City of New York*
*Attorney for Defendants the City of New York,*
*the New York City Department of Education,*
*and Daysi Garcia*
*100 Church Street, Room 2-315*
*New York, N.Y.  10007*

*Of Counsel:  Jane E. Andersen*
*Tel:  (212) 788-0870*
*Matter #. 2009-006720*

*Due and timely service is hereby admitted.*

*New York, N.Y.  ........................................................, 201.….*

*.......................................................................................... Esq.*

*Attorney for..........................................................................*