UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x          09-Civ-442 (ILG) (JO)
CASEY PHILLIP,

                              Plaintiff,


             -against-


THE CITY OF NEW YORK, NEW YORK CITY
DEPARTMENT OF EDUCATION, DAYSI GARCIA,
Principal of PS65K, MARTHA RODRIGUEZ-TORRES,
Local Instructional Superintendent,

                              Defendants.
--------------------------------------------------------------------x


**PLAINTIFF'S CASEY PHILLIP'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**


OFODILE & ASSOCIATES, P.C.
498 Atlantic Avenue
Brooklyn, NY 11217
718 862-8300

## TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -iii-

SUMMARY OF ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL ALLEGATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STANDARD FOR SUMMARY JUDGMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      I. RETALIATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

             1) Plaintiff has provided sufficient evidence to show that a causal connection existed between the protected activity and the adverse employment action. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

             2) Plaintiff has provided sufficient evidence to show that Defendants' reasons were pretext.. . . . . . . . . . . . . 20

      II. HOSTILE WORK ENVIRONMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

         Plaintiff has provided sufficient evidence to  show that Defendants' created a hostile work environment
         . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      III. RETALIATORY HOSTILE WORK ENVIRONMENT. . . . . . . . . . . . . . . . 27

        1) Plaintiff has provided sufficient evidence to show that Defendants subjected him to a retaliatory hostile work environment
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        2) Pretext. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

      IV. DISPARATE TREATMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        1) Plaintiff has provided sufficient evidence to show that adverse employment decisions taken by Defendants took place under circumstances giving rise to an inference of discrimination

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

       2) Plaintiff has provided sufficient
          evidence to show that Defendants' reasons were pretext.. . . . . . . . . . . . 34

   V.    Principal Garcia Is Not Entitled to Qualified Immunity. . . . . . . . . . . . . . . . . . 36

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

## TABLE OF AUTHORITIES

**Cases**                                                                              **Pages**

*Ali v. Tribune Entertainment Co.,*
    *1996 U.S. Dist. LEXIS 9628 (S.D.N.Y. July 9, 1996).* . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Anderson v. Hertz Corp.,*
    *507 F. Supp. 2d 320, 327 (S.D.N.Y. 2007)..* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Anderson v. Liberty Lobby, Inc.,*
    *477 U.S. 242, 255 (1986)..* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Andrews v. City of Philadelphia,*
    *895 F.2d at 1485.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 25

*Bombero v. Warner-Lambert Co.,*
    *142 F. Supp.2d 196, 203 n.7 (D. Conn. 2000)..* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Burlington N. and Santa Fe Ry. Co. v. White,*
    *548 U.S. 53, 126 S. Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006)* . . . . . . . . . . . . . . . . . . . . 27

*Cannizzaro v. Principi,*
    *2005 U.S. Dist. LEXIS 4819 (E.D.N.Y. Jan. 6, 2005).* . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Carmellino v. Dist. 20 of N.Y. City Dep't of Educ.,*
    *No. 03-cv-5942, 2006 U.S. Dist. LEXIS 63705 ,*
    *2006 WL 2583019, (S.D.N.Y. Sept. 6, 2006)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Cifra v. Gen Elec. Co.,*
    *252 F.3d 205, 216 (2d Cir. 2001).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Cronin v. Aetna Life Ins. Co.,*
    *46 F.3d 196, 203 (2d Cir. 1995).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Cronin v. Aetna Life Ins., Co.,*
    *46 F.3d 196 (2d Cir. 1995).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Dillon v. Coles,*
    *746 F.2d 998, 1003 (3d Cir. 1984).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Donahue v. Windsor Board of Fire Commissioners,*
    *834 F.2d 54, 57 (2nd Cir. 1987)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Edwards v. William Raveis Real Estate, Inc.,*
    *2010 U.S. Dist. LEXIS 99758 (D. Conn. Sept. 21, 2010)*.. . . . . . . . . . . . . . . . . . . . . . . 34

*Fisher v. Vassar College,*
    *114 F.3d 1332, 1336 (2d Cir. 1997) (en banc), cert. denied,*
    *522 U.S. 1075, 139 L. Ed. 2d 752, 118 S. Ct. 851 (1998).* . . . . . . . . . . . . . . . . . . . . . . . 30

*Gallo v. Prudential Residential Services Ltd. Partnership,*
    *22 F.3d 1219, 1223 (2nd Cir. 1994).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Gorzynski v. Jetblue Airways Corp.,*
    *596 F.3d 93, 2010 WL 569367, at *15 (2d Cir. Feb 19, 2010).* . . . . . . . . . . . . . . . . . . . 18

*Graham v. Long Island R.R.,*
    *230 F.3d 34, 38-39 (2d Cir. N.Y. 2000).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Gregory v. Daly,*
    *243 F.3d 687, at 694-95 (2d Cir. 2001).*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Hargett v. National Westminster Bank, USA,*
    *78 F.3d 836 (2d Cir. N.Y. 1996).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 34

*Harris v. Forklift Systems, Inc.,*
    *510 U.S. 17.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Harris v. Provident Life & Accident Insurance Company,*
    *310 F.3d 73, 78 (2nd Cir. 2002).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Hollander v. American Cyanamid Co.,*
    *895 F.2d 80, 85-86 (2d Cir. 1990).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Hughes v. United Parcel Service, Inc.,*
    *2004 NY Slip Op 51008U; 798 NYS2d 344; 2004 NY Misc. LEXIS 1552*. . . . . . . . . . . . 22

*International Bhd. of Teamsters v. United States,*
    *431 U.S. 324, 335 n.15, 52 L. Ed. 2d 396, 97 S. Ct. 1843 (1977).* . . . . . . . . . . . . . . . . . 30

*Johnson v. County of Nassau,*
    *480 F. Supp. 2d 581, 594 (E.D.N.Y. 2007)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Jute v. Hamilton Sundstrand Corp.*,
   420 F.3d 166, 180 (2d. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Khan v. HIP Centralized Lab. Servs.*,
   2006 U.S. Dist. LEXIS 19641 (E.D.N.Y. Mar. 27, 2006). . . . . . . . . . . . . . . . . . . . . . . . 29

*Long Island R.R.*,
   230 F.3d 34, 39 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Manoharan v. Columbia University College of Physicians & Surgeons*,
   842 F.2d 590, 593 (2d Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). . . . . . . . . . . . . . . . . . . . . . . . . 29

*McNair v. N.Y. City Health and Hosp. Co.*,
   160 F. Supp. 2d 601, 604 (S.D.N.Y. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Montana, 869 F.2d at 106* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Moore v. City of Philadelphia*,
   461 F.3d 331, 352 (3d Cir. Pa. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Morris v. Lindau*,
   196 F.3d 102, 110 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*National R.R. Passenger Corp., v. Morgan*,
   536 U.S. 101, 122 S.Ct. 2061 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Norville v. Staten Island Univ. Hosp.*,
   196 F.3d 89, 95 (2d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Philippeaux v. Fashion Inst. of Tech.*,
   1996 U.S. App. LEXIS 33507, 3-4 (2d Cir. N.Y. Dec. 23, 1996). . . . . . . . . . . . . . . . . . . 18

*Quinn v. Green Tree Credit Corp.*,
   159 F.3d 759. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Reed v. A.W. Lawrence & Co.*,
   95 F.3d 1170, 1178 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Shumway v. United Parcel Serv., Inc.*,
   118 F.3d 60, 63 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*St Mary's Honor Ctr. v. Hicks,*
    *509 U.S. 502, 506, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993)* .. . . . . . . . . . . . . . . . . . . 30

*Summer v. U.S. Postal Service,*
    *899 F.2d 203, 208 (2d Cir. 1990).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Svenningsen v. The College of Staten Island,*
    *2003 U.S. Dist. LEXIS 25816.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Tekula v. Bayport-Blue Point Sch. Dist.,*
    *295 F. Supp. 2d 224, 231 (E.D.N.Y. 2003)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Texas Dep't of Community Affairs v. Burdine,*
    *450 U.S. 248, 252-53, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981).* . . . . . . . . . . . . . . . . . 29

*Treglia v. Town of Manlinus,*
    *313 F.3d 713, 722 (2d Cir. 2002)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 33

## **Statutes**                                                                                     **Pages**

Civil Rights Act of 1866, 42 U.S.C. § 1981 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

New York City Administrative Code.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

New York State Human Rights Law section 296 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Title VII. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000-e, et seq.. . . . . . . . . . . . . . . . . 36

## SUMMARY OF ARGUMENTS

Within two weeks of Defendant Garcia's acknowledged receipt of Plaintiff's charge of discrimination from the EEOC in February 2007, she took over the supervision of Plaintiff which had hitherto been the Assistant Principal's job for all teachers in Plaintiff's Grade and started giving Plaintiff, almost on a daily basis, disciplinary letters to file, complaining about one performance problem or the other, both inside and outside the class room, including that he did not interact with other staff enough or that when he interacted, he was not friendly enough. Plaintiff, who had hitherto received satisfactory evaluations which were signed and approved as satisfactory by Defendant Garcia, including in January 2007, received unsatisfactory evaluations, was referred for psychiatric evaluation because he alleged that he was being subjected to discrimination and retaliation by Garcia, and was falsely accused on many occasions of exposing students to danger. Plaintiff had received satisfactory evaluations during the prior five or so years, the evaluations noting many times what his strengths were. His strengths from all prior evaluations turned into weaknesses and after complaining of discrimination, there was nothing that he did that was acceptable or satisfactory. Even selection of topics on issues of the day to discuss with students in his social studies class was a ground for disciplinary action. Defendants were so vindictive that they had the Department of Homeland Security revoke Plaintiff's visa before he could finish his administrative hearing which he was entitled to by contract. Plaintiff claims that he was subjected to retaliatory termination of his employment for complaining about discrimination and to retaliatory hostile work environment, among other claims.

## FACTUAL ALLEGATIONS

Plaintiff Casey Phillip is a Black male.  See Deposition of Plaintiff Casey Phillip (hereinafter Phillip Tr.,)  p. 65 annexed to the Affirmation of Anthony C. Ofodile (hereinafter, Ofodile's Aff.) as Exh. 31.  Plaintiff began his employment as a New York City public school teacher on or about January 13, 2003.  Phillip Tr., p. 33.  He was employed as a public school teacher at P.S. 65K from 2003 to 2007.  Phillip Tr., p. 33.

Plaintiff received two satisfactory teaching observations in the school year 2004-2005 and an end of year overall satisfactory rating at the end of that school year, all from Principal Daysi Garcia.  See Annual Professional Performance Review and Report...for 2004 annexed to Ofodile Aff., Exh. 1. In the 2005-2006 school year Plaintiff received two satisfactory teaching observations from Assistant Principal Mendez, and end of year overall satisfactory rating at the end of that school year, from Principal Garcia. See Ofodile Aff., Exh. 2. On February 9, 2005, Defendant Garcia wrote a letter of recommendation praising Plaintiff's work as a teacher.  See Ofodile's Aff., Exh. 3, Ofodile Exh. 32, Garcia 1st Dep. 19-21.  The letter states in relevant parts that

> Mr. Phillip cares a great deal for his student, his teaching style provides much needed structure and continuity in his classroom, he is open and congenial and sets a positive tone which makes learning enjoyable to his students.
> It goes on further to commend Mr. Phillip with regards to the balance literacy approach.  It reads "His classroom environment is rich, containing all the essentials requisites vital to a balanced literacy approach.  "As a result of his professional development, he has learned to accurately access each student's academic level, so that he can prepare individualized work to help them move to the next level.  He keeps copious notes and logs on each student and confers regularly with each on their progress.  Mr. Phillip openly accepts constructive feedback and is a joy to supervise."

However, despite Principal Garcia's glowing recommendation of Plaintiff's teaching in 2005, Defendant Daysi Garcia subjected Plaintiff to what Plaintiff reasonably believed to be disparate treatment, and a hostile work environment on account of his race, color, and ethnicity beginning around 2004 and retaliation for his complaints of discrimination in 2007.

In or about November 2004, Defendant Garcia came to Plaintiff's fourth grade class to observe him teach a Balanced Literacy lesson. Phillip Tr., p. 60-63. She positioned her chair so that she had her back turned to Plaintiff during the entire observation.  Id.  She said that she wanted to see the expressions on the students' faces, not their teacher's face.  Id. Her conduct was an aberration.  Id.  Plaintiff had been teaching for 10-plus years at that point and during the many observations that he had received, the administrator conducting the observation had always positioned himself/herself in a way that he/she could see both the teacher and the students. Id. After the observation, Plaintiff – who was the only Black teacher and only individual from the Caribbean teaching fourth grade at that time – asked a couple of his non-Black, non-Caribbean colleagues teaching the fourth grade if they had the same experience with Defendant Garcia and they told him that they had not.  Id.  See also Ofodile Aff., Exh. 4, letter from Casey Phillip's to Maritza Rondon-Velazquez dated September 17, 2008.

In the Fall of 2004, Defendant Garcia also did not follow protocol in handling a student/parent complaint against Plaintiff, whereas she did follow protocol in handling complaints about his non-Black, non-Caribbean colleagues.  See Phillip Tr., p. 67-72.  See Deposition of Daysi Garcia's (hereinafter referred to as Garcia's dep.,) dated March 9, 2010, p. 128, annexed to Ofodile's Aff. as Exh 32.  Defendant Garcia told Plaintiff after the fact, while Plaintiff was picking up his mail in the main office, that the mother of a student had just made a

complaint about Plaintiff to her. Phillip Tr., p. 67-72. Garcia said that the mother had told her that the student had reported that Plaintiff had told the class never to inform or tell their parents, the principal, or assistant principal of any incident that transpires in the classroom. Id.  Garcia also told Plaintiff that the parent was on her way to the Chancellor's Office to make the same complaint. Id.  Defendant Garcia had not called Plaintiff into the office to respond to this very serious allegation while the parent was there and Plaintiff only found out about this allegation soon after it was made by happenstance. Id.  Plaintiff caught up with the parent, told her that he never made any such comment to his students, and suggested that they meet with her daughter and the principal. Id. The parent agreed. During the meeting, the student admitted that Plaintiff had never made this comment to the class and that she didn't know why she had claimed that Plaintiff had. Id.

On June 28, 2005, the last day of the 2004-2005 school year, Plaintiff went to Ms. Garcia's office to turn in his classroom key and collect his pay stubs. In the presence of Regina Grandner (then Math Coach), Defendant Garcia made the following racist comment to Plaintiff, "When you return in September, I'll be a slave driver."  Phillip Tr., p. 73-74.

In October/November 2005, Defendant Garcia treated Plaintiff and another Black, Caribbean teacher, Lucienne Mohammed, differently from their Hispanic colleagues by giving Plaintiff and Mohammed only a weekend's notice to prepare a lesson plan for a pre-observation meeting that was going to lead to an actual class observation a couple of days later, while giving their Hispanic colleagues approximately two weeks notice. Phillip Tr., p. 98-105. Garcia also gave Plaintiff and Mohammed a 10-page document to adhere to for the observation while not giving this document to their Hispanic counterparts.  Id.

Garcia also treated Plaintiff differently than his White and Hispanic counterparts with respect to internships. Plaintiff, Regina Granduer (a White female), Wendy Glash (a White female), and Vanessa Rosa (a Hispanic female) were all studying to be school administrators, which required among other things doing an internship under the supervision of a "mentor". Phillip Tr. 79-90.  In or about March 2006, Plaintiff and these other teachers arranged with Defendant Garcia to perform their internships under her mentorship at P.S. 65K on top of their teaching duties. Id.

Although Ms. Garcia initially agreed to allow Plaintiff to do the internship at P.S. 65K under her mentorship, she soon tried to rescind her agreement with him, while not trying to rescind the agreement with the White and Hispanic teachers.  Phillip Tr. 82.  After Michelle Brauer (the United Federation of Teachers Chapter leader at P.S. 65K) told Ms. Garcia that Plaintiff could sue her for discrimination based on her actions and after Ms. Garcia's mentor, Joyce Mitchell, spoke with her, Defendant Garcia reluctantly agreed to allow Plaintiff to carry on the internship.  Phillip Tr. 106.  Ofodile Aff., Exh. 4, letter from Casey Phillip to Maritza Rondon-Velazquez dated September 17, 2008, p. 5-6.

However, she tried to prevent Plaintiff from fulfilling the requirements for the internship, while not sabotaging his White and Hispanic counterparts.  Id.  The college where Plaintiff was studying to be an administrator gave Plaintiff a document outlining several skills – known as "competencies" – that he was required to work on during his internship. Phillip Tr. 79-90. Plaintiff, in turn, gave this document to Defendant Garcia.  Id.  Under the pretext of giving Plaintiff duties to fulfill his internship, Ms. Garcia gave Plaintiff duties that had nothing to do with the requirements of his internship and that were actually the duties of an aide, not a teacher

5

or an administrator.  Id.  These included breakfast duty, yard duty, lunch duty, and bus duty. On the other hand, Ms. Garcia gave Granduer, Glash, and Rosa duties that allowed them to actually meet the requirements of their internships, such as tasks that brought them in direct contact with their colleagues.  Id.

Plaintiff had to try to find a way to obtain duties to meet the competencies. Because Ms. Garcia essentially refused to mentor Plaintiff in the duties that he needed to fulfill his competencies, he found a mentor in Assistant Principal Yvette Mendez.  Phillip Tr. 79-90.  He gave Ms. Mendez the internship papers to complete as she was actually the person who had been mentoring him.  Id.  Ms. Garcia prohibited Ms. Mendez from rating Plaintiff, insisted on doing it herself, and gave Plaintiff the lowest or almost lowest possible rating.  Id. She did not give low ratings to his White and Hispanic counterparts.  Id. Ms. Garcia had actually expressed to Plaintiff that she was not looking forward to working with Plaintiff as an administrator.  Id.

In addition, on or about March 2, 2006 and several times thereafter, Defendant Garcia beckoned Plaintiff with a demeaning hand gesture rather than calling Plaintiff by his name.  She even did this to Plaintiff in front of Plaintiff's students. Phillip Tr., p. 176-179.  Upon Plaintiff's information and belief, Defendant Garcia did not do this to any of his non-Black, non-Caribbean colleagues.  Id. at 177-178..

Further, for the school year of 2006-2007, Defendant Garcia assigned a class of 25 at-risk students (students with behavior and learning problems) and failed and refused to assign him an assistant.  Phillip Tr., pp. 147-157.  See letter dated October 16, 2006 and letter dated October 26, 2006 annexed to Ofodile Aff. as Exh. 5.  James Caulfield, a White male teacher, had a substantially smaller class made up of about 14-16 of the students that Plaintiff had and was

assigned an assistant for two full days per week.  Phillip Tr., pp. 147-148.  Plaintiff, Assistant

Principal Ms. Mendez, and United Federation of Teachers (UFT) Chapter Leader Jonathan

Horton requested this assistant for Plaintiff from Garcia (Plaintiff doing so repeatedly), and

Defendant Garcia repeatedly denied Plaintiff an assistant. Phillip Tr., p. 148.  Assistant Principal

Ms. Mendez also asked Ms. Garcia to separate Plaintiff's most problematic students. Ms. Garcia

responded to Ms. Mendez with, "Let him [ie. Casey Phillip] handle it."  Phillip Tr, p. 157.  These

students had been actually removed from Mr. Caulfield's class because of behavioral problems.

Id. at 147.

In or about October 2006, Defendant Garcia also fabricated charges against Plaintiff.  See

Phillip Tr., p. 130-135, letter dated October 24, 2006 annexed to Ofodile's aff. as Exh. 6.

Defendant Garcia falsely alleged to Plaintiff's UFT representative, Alan Weinstein, that almost a

week prior, Plaintiff had left students unsupervised after 3:00 p.m. Id.  Garcia had not mentioned

the allegation to Plaintiff in the intervening period of almost a week, could not name the students

whom Plaintiff allegedly left unsupervised, and knew that Plaintiff finished his workday at 3:00

p.m. and therefore could not have left students unsupervised after 3:00 p.m. Id.

Plaintiff had never left his classroom until the after-school teacher came and relieved him.

Id. Defendant Garcia was trying to sabotage Plaintiff's career and did not try to reprimand

non-Black, non-Caribbean teachers who had actually left their students unsupervised.  Id, see e-

mail from Weinstein to Phillip dated April 19, 2007, Ofodile Aff., Exh. 7.  Plaintiff was

informed of a conversation in which Defendant Garcia was overheard saying that she was going

to "fix Mr. Phillip." Id.

7

On November 7, 2006 (Election Day), public schools were closed and Defendant Garcia held her annual Staff Development Day. On this day, the literacy coach, Ilene Brodsky, led a professional development session modeling a read-aloud.  Phillip Tr., p. 112-119.  The book that Ms. Brodsky used was the "The Cays." Ms. Brodsky asked Plaintiff to read the part of a "Negro" in a very insensitive, demeaning, and humiliating reading. Id.  She told him that she was asking him to read it because he had the "right accent."  Id.  at 113.  The "Negro" was portrayed in the book in a very offensive way, as conveyed in the following description, which Ms. Brodsky read herself: "I saw a huge, very old Negro sitting on the raft near me. He was ugly. His nose was flat and his face was broad; his head was a mass of wiry gray hair.  Id.  at 113.  For a moment, I could not figure out where I was or who he was…" Ms. Brodsky asked Plaintiff to read the following statements by the Negro: "You 'ad a moss terrible crack on d'ead, bahss. A strong-black glanc ofen your 'end, an' I harly about aboard dis raff."  Id.  at 113.  Plaintiff did not read the passage as he was asked to do and was very embarrassed and humiliated.  Phillip Tr., p. 112-119.

Defendant Ms. Garcia must have approved and condoned the use of the book of "The Cays" and the way that Ms. Brodsky conducted the workshop, for it was practice for principals to: meet with their support team/coaches to plan and discuss the strategies and materials to be used in the professional development; and have the final say on what strategies and materials were ultimately used. Phillip Tr. 116-119, Rodriguez-Torres 2nd Tr. 4-8 (Ofodile Exh. 35). Furthermore, Defendant Daysi Garcia personally checked in on the professional development session several times.  Id.  She sat in the back smiling while Ms. Brodsky asked Plaintiff to read the passage and Plaintiff was later informed by one of his colleagues that Ms. Garcia laughed at Plaintiff being asked to mimic the "Negro."  Id.

8

Plaintiff was also the only teacher required to read with his class a book entitled, "Roll of Thunder, Hear My Cry" which used the word "nigger" repeatedly.  Phillip Tr., p. 181.

For the 2006-2007 school year, Defendant Ms. Garcia also implemented a segregation policy.  Phillip Tr., p. 185-188.  Ms. Garcia manipulated the schedule so that Plaintiff and the only other Black and Caribbean teacher teaching fifth grade were scheduled to have lunch during a separate time period from their two colleagues, one of whom was Hispanic and the other of whom was Guyanese/Indian. Id.  The teachers in the third grade (all of whom were Hispanic or White) had lunch together, as well as the teachers in the fourth grade (all of whom were Hispanic and White).  Id.  Defendant Ms. Garcia's pretextual explanation for this segregation policy was that the lunchroom could not accommodate all of the fifth grade classes in a single lunch period. Id.

However, there were only four fifth grade classes, while there were five third grade classes and five fourth grade classes and all of the third grade classes had lunch together and all of the fourth grade classes had lunch together. Id.  In addition, the year before Garcia implemented this segregation policy, there were five fifth grade classes and all five were scheduled for lunch during the same period. Id.

Furthermore, on December 22, 2006, the staff had a luncheon in the school library. Of the four fifth grade teachers – Plaintiff, Ms. Mohammed (who is Black), Rosa Ruiz (who is Hispanic), and Samnanth Narine (who is a dark-skinned Guyanese/Indian) – Defendant Garcia only informed Ms. Ruiz, the Hispanic teacher about the luncheon.  Phillip Tr., p. 109-110. All of the dark-skinned teachers in the fifth grade were excluded.  Id.

9

Defendant Garcia also discriminated against and embarrassed Plaintiff in the following ways. While Plaintiff was performing the line-up duty and leading the students in the singing of the national anthem, Plaintiff was a little off-key.  Phillip Tr, p. 188-190.  Defendant Garcia, in the presence of the five fifth grade classes, five fourth grade classes, teachers, schools aides, and several parents, proceeded to insert her index finger into her open mouth.  Id.  As far as Plaintiff is aware, Ms. Garcia never engaged in such an act of un-professionalism while non-Black, non-Caribbean teachers were leading the national anthem, including but not limited to Mr. Gagliano, who was also sometimes off-key.  Id.

In addition, the following incident happened at a cultural day for the fifth grade classes that Plaintiff had worked to coordinate.  Phillip Tr., p. 172-175.  Plaintiff's class was the fifth or sixth act in the program. When his class got up to perform, Defendant Garcia, Regina Granduer, Wendy Glash, Ilene Brodsky, and Vanessa Rosa all got up and walked out. Phillip Tr., p. 173. This was the only performance for which they did not stay.  Phillip Tr., p. 172-175.  They returned right after Plaintiff's class had performed. Plaintiff's students, who had worked extremely hard for this event, asked why the principal had not stayed around for their performance.  Id.  Their feelings were obviously hurt.  Id.

On or about December 14, 2006, Plaintiff requested copies of documents from his personnel file.  On December 22, 2006, the UFT Chapter Leader, Jonathan Horton, informed Plaintiff that some of the documents that he had requested had been shredded by Ms. Garcia. Phillip Tr., p. 106-109.  See Letter from Phillip to Garcia dated January 12, 2007, and letter dated January 10, 2007 from Garcia to Phillip annexed to Ofodile Aff., as Exh. 8.  These shredded documents included Plaintiff's internship documents and letters of recommendation and

10

commendation.  Id.  The destruction of these documents jeopardized Plaintiff's chances of

becoming a principal.  Id.  Plaintiff is not aware of any other teacher whose documents Ms.

Garcia destroyed.  Id.

      Defendant Garcia also used derogatory terms to refer to Plaintiff.  Phillip Tr., p. 190.

      On or about December 26, 2006, Plaintiff filed a complaint with the Office of Equal

Opportunity in the New York City Department of Education, complaining that Defendant Daysi

Garcia was discriminating against him on the basis of his color, race, and national origin.  Phillip

Tr., p. 200.  On or about January 4, 2007, Plaintiff filed a Charge of Discrimination with the U.S.

Equal Employment Opportunity Commission against the New York City Department of

Education and the City of New York, asserting race, color, and national origin discrimination.

Phillip Tr., p. 201.  Plaintiff re-filed this complaint with the EEOC in late January/early February

2007 after the EEOC claimed it had no record of him filing with them or visiting their office on

1/4/07.  Id.  The EEOC received the secondly filed complaint on or about 2/7/07.  Id.  Defendant

Garcia was informed of and responded to these complaints.  See EEOC letter dated February 20,

2007 annexed to Ofodile Aff., as Exh. 9. Garcia's dep., dated March 16, 2010 p. 6-8, 15-16, 18.

      Soon after Plaintiff filed these complaints and/or while they were being prosecuted,

Defendant Garcia and other administrators subjected Plaintiff to further discriminatory and

retaliatory acts.  Phillip Tr., p. 126-127.  They barraged Plaintiff with unjustified write-ups and

negative evaluations, which eventually led to Plaintiff's removal from the school in June 2007.

Id.  See letter dated March 8, 2007, Ofodile's Aff., Exh. 19, Letter dated March 30, 2007 from

Garcia, Exh. 20, Letter dated April 6th, 2007 by Phillip in Response to March 30, 2007 letter Exh.

21, Letter dated April 13, 2007 from Garcia Exh. 22, letter in response to April 13, 2007 from

Phillip, Mohammed, and Narine respectively, Exh. 23.  In addition, letters from Garcia to Phillip dated May 4, 7, 15, 16, 25, and 29, 2007 and  June 1, 4, 11, and 18, 2007 all annexed to Ofodile's Aff., as Exh. 24. Garcia 2nd Dep. 45-48 (Ofodile Exh. 33)

For example, on or about January 2, 2007, Defendant Ms. Garcia directed Yvette Mendez to place a letter in Plaintiff's official file for not adhering to a pacing calendar for a test preparation guide, while not writing up White and Hispanic teachers who were also not in compliance with the pacing calendar.  Letter dated January 2, 2007 annexed to Ofodile Aff., as Exh. 10; Phillip Tr., p. 140-142.  Further compliance with the Pacing Calendar was "suggested" and not mandatory.  See Jonathan Horton's testimony in the Section 3020-a Education Law Proceeding dated March 11, 2008 at document bate-numbered D 002957 (p. 2447 line 19), Ofodile's Exh. 25.

In addition, on or about January 2, 2007, Defendant Local Instructional Superintendent Martha Rodriguez-Torres began visiting Plaintiff's classroom.  Phillip Tr., p. 142-145.  The Local Instructional Superintendent had never visited Plaintiff's classroom before and Plaintiff was not aware of any other teacher whose classroom was visited by the Local Instructional Superintendent.  Id.

In addition to visiting Plaintiff's classroom on January 2, 2007, Ms. Torres visited Plaintiff's classroom on April 17, 2007 and during that visit gave Plaintiff an evaluation that grossly misrepresented what she had observed, as well as "U" rating.  Phillip Tr., p. 171-172.  See Rodriguez Observation dated May 1, 2007, Ofodile's Aff., Exh. 15, and Phillip's response to Rodriguez-Torres Observation dated May 2, 2007, Ofodile's Aff.,  Exh. 16, Rodriguez-Torres 1st Dep. pp. 15-35 (Ofodile Exh. 34).

On or about March 16, 2007, Defendant Garcia gave Plaintiff a counseling letter for allegedly not walking his students directly to the gate at dismissal. See Ofodile's Aff., Exh. 11. Phillip Tr., p. 135-137. Plaintiff did in fact walk his students to the gate and Defendant Garcia did nothing to reprimand a Hispanic teacher, a White teacher, and an Asian teacher who actually allowed their students to run wildly and unsupervised from the door to the gate.  Id.  See letters from Mr. Phillip's students dated March 15, 2007, and letters from teachers Mohammed and Narine also annexed to Ofodile's Aff., Exh. 11.

On or about March 19, 2007, Defendant Garcia pretended to observe Plaintiff's teaching even though he had met the required number of observations for the year with all satisfactory ratings.   See Observations by Mendez on September 28, 2006, and January 25, 2007 annexed to Ofodile's Aff., as Exh. 12, Phillip Tr.163- 165, Garcia 2nd Dep. p. 29 (Ofodile Exh 33). Defendant Garcia had denied Plaintiff's request to have a third person present for the "observation."  Plaintiff' s dep., p. 165-166; letter dated March 9, 2007 from Phillip annexed to Ofodile's Aff., as Exh. 13.  Garcia gave Plaintiff his first-ever "unsatisfactory" rating, even though he had satisfactorily met all of his teacher observations.  Phillip Tr., p. 163-165; Observation report of March 19, 2007 alongside Phillip's response annexed to Ofodile's Aff., as Exh. 14.  In an effort to make it seem that this "unsatisfactory" rating was not Plaintiff's first "U" rating, the Department of Education staff attorney Katherine G. Rodi authored a document that claimed that Plaintiff had been "U" rated at P721Q while Plaintiff was a teacher there.  Phillip Tr., p. 170.  However, Plaintiff had never even taught at P721Q and never received a "U" rating before.

In the letters that Ms. Garcia put in Plaintiff's file, she often described Plaintiff as "loud",
which was a characterization she often made of Black males.  Phillip Tr., p. 190

On or about April 17, 2007, Defendant Daysi Garcia further retaliated and discriminated
against Plaintiff by unjustifiably referring him for a psychiatric evaluation and making grossly
false statements about his behavior and character. Phillip Tr., p. 158, Garcia 2nd Tr. p.51-52. In
her recommendation of Plaintiff for medical evaluation, she specifically stated that among
Plaintiff's troubling behaviors was his "false accusations of discriminatory, prejudice and racist
remarks and/or actions."  Id.  See Ofodile's Aff., Exh. 17.

On or about April 18, 2007, Plaintiff filed another complaint with the Department of
Education's Office of Equal Opportunity.  See Ofodile Aff., Exh. 4, letter from Casey Phillip to
Maritza Rondon-Velazquez dated September 17, 2008.  In this complaint, he complained that
Defendant Garcia was retaliating against him for the aforementioned discrimination complaints.
Id.  Plaintiff also filed a union grievance against Garcia, alleging, among other things, that
Plaintiff was subjecting him to discriminatory behavior and harassment based on his race, color,
and national origin.  Id.

About the time Plaintiff filed these additional complaints, Defendant Garcia began using
Assistant Principal Jaggon, who is Black, as a conduit through which to discipline Plaintiff.
Phillip Tr., p. 198-199. AP Jaggon placed several letters in Plaintiff's file.  Id.  See Ofodile's
Aff., Exh. 18.

On or about June 8, 2007, Plaintiff made a further complaint of discrimination when he
and several other teachers met with Defendant Local Instructional Superintendent Martha
Rodriguez-Torres and Regional Superintendent Dr. Kathleen Cashin to complain about

14

Defendant Garcia's discriminatory treatment of them.   Defendants admit this on ¶ 97-98 of Defendants Rule 56.1 statement of undisputed facts.  On or about June 12, 2007, Plaintiff and the other teachers wrote a follow-up letter to Dr. Cashin.  Later on in June 2007, within days of the complaint to Torres and Cashin and while the OEO and EEOC complaints were still pending, Plaintiff was removed from teaching at P.S. 65K and was brought up on 3020A charges.  See e-mail from Arons Elizabeth dated June 6, 2007, Ofodile Aff., Exh. 26.  Phillip Tr., p. 8. Plaintiff's dep., p. 195, 217.  During the 3020A hearing, the DOE used as evidence against Plaintiff the fictitious document from the DOE claiming that Plaintiff had taught at P721Q and had received a "U" rating there, as well as the false write-up by Martha Rodrigues-Torres. Phillip Tr., p. 170-172.  Plaintiff was assigned to sit in a "rubber room" for more than a year.  Phillip Tr., 217, Ofodile's Aff., Exh. 27.

In October 2008, Defendants subjected Plaintiff to further discrimination and retaliation when they informed him that his H-1 B visa had been revoked, that he had been removed from the payroll, and that he had been terminated and should not return to the reassignment center. Phillip Tr., p. 206-207.  Plaintiff never received any papers stating that he had been officially terminated.  Id.

Defendant Garcia's discrimination against Plaintiff on the basis of race, national origin, and color occurred against a background of Defendant Garcia discriminating against individuals of color.  Phillip Tr., p. 191-195; See Document Bate numbered 001543, entitled PS 65 Ethnicity Breakdown 2003-2007 Ofodile Aff., Exh.28.  Between 2004 and 2007, Defendant Garcia removed, did not rehire, caused the removal, or caused not be rehired ten staff members of color. Id.  In addition, between 2004 and 2007, Ms. Garcia forced two staff members of color to have

15

psychiatric evaluations.   Id.   In addition, as of September 2008, four teachers from P65K had

filed some form of race-based discrimination charges against Ms. Garcia and there was only one

Black classroom teacher at P.S. 65K.   Id.   In addition, although the DOE has placed several

Black Assistant Principals at P65K during Ms. Garcia's tenure there, she has forced them out.

Id.   For example, in December 2004, Ms. Garcia caused Assistant Principal Belinda Bell Farmer

to be demoted back to a math coach position after Farmer had only been AP for about three

months.  Id.   Further, Assistant Principal Diedre Lacey resigned in June 2005 after only four

months as AP, and upon information and belief, she resigned under threat that if she didn't, Ms.

Garcia would cause her to be demoted. Furthermore, in September 2005, Leatrice Johnson was

hired as an AP and Ms. Garcia immediately assigned her to the annex, which was two miles

away from the main building.

     Further, two teachers of African descent, other than Plaintiff, Asha Marrero and Lucienne

Mohammed, filed a complaint of discrimination against Defendant Garcia on the basis of race.

See Ofodile Exh. 29, and Exh. 30.

     In addition, White and Hispanic teachers who associated with Plaintiff and/or other Black

teachers were blackballed or retaliated against by Defendant Garcia who had told them not to

associate with Plaintiff and other Black teachers.  Phillip Tr., p. 195.  For example, Defendant

Garcia caused a Hispanic teacher named Yessenia Francisco to lose her license after Ms.

Francisco refused Ms. Garcia's request that she stop associating with Plaintiff and other Black

teachers.  Id.

     Plaintiff has suffered immense emotional, mental, and physical distress as a result of

Defendants' actions.  Phillip Tr., p. 206-220.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the record, viewed in light most favorable to the non-moving party, reveals that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law – *Rule 56 (c) of Federal Rules of Civil Procedure*. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)*.

In order for the Court to grant Defendants' Motion for Summary Judgment, "not only must there be no genuine issue as to the evidentiary facts, but there must also be no controversy regarding the inferences to be drawn from them." *Donahue v. Windsor Board of Fire Commissioners*, *834 F.2d 54, 57 (2nd Cir. 1987)* (quoted in *Harris v. Provident Life & Accident Insurance Company, 310 F.3d 73, 78 (2nd Cir. 2002)*).

On a motion for summary judgment, what the Court cannot do is weigh the evidence or try issues of fact. *See  Gallo v. Prudential Residential Services Ltd. Partnership, 22 F.3d 1219, 1223 (2nd Cir. 1994)*.  Weighing the evidence is for the trier of fact.  Even on the claims that the Court believes the Plaintiff may lose at trial, at the summary judgment level, if there are disputed issues of fact, the Court cannot grant summary judgment on those claims.  *See Anderson, 477 U.S. at 242 (1986)*.  The Court's only duty at the summary judgment level is to determine whether there are issues of fact to be tried.  *See Cronin v. Aetna Life Ins., Co.*, *46 F.3d 196 (2d Cir. 1995)*.

## ARGUMENT

### I. RETALIATION

A plaintiff's claim of retaliation is evaluated under the McDonnell Douglas burden

shifting framework.  See *Summer v. U.S. Postal Service, 899 F.2d 203, 208 (2d Cir. 1990)*.  First, plaintiff must prove a prima facie case by presenting evidence sufficient to permit a rational trier of fact to find that (1) he participated in a protected activity, (2) the defendant knew of this activity, (3) he experienced an adverse employment action, and (4) a causal connection existed between the protected activity and the adverse employment action.  *Cifra v. Gen Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001)*.  Alternatively, Plaintiff may prove his retaliation claim through a strong temporal proximity. A temporal relationship between the protected activity and the adverse action - even when there are as much as five months apart - can establish a prima facie case of retaliation as a matter of law - See *Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 2010 WL 569367, at *15 (2d Cir. Feb 19, 2010)*.

Here, Defendants cannot contest that Plaintiff engaged in a protected activity when he filed a complaint with Defendants' OEO office and another complaint with the EEOC office in February of 2007.  Defendants admit that Defendants knew of Plaintiff's protected activity. Defendants cannot contest that Plaintiff experienced an adverse employment action when, after he engaged in a protected activity, he received twenty (20) critical letters to his file, two formal and one informal U-rating, termination of Plaintiff's employment as a teacher, and that they asked the Department of Homeland Security to revoke his Work Visa.

In order to prove that a causal connection existed between a plaintiff's protected activities and the alleged retaliatory action by the defendant, the plaintiff must demonstrate either (1) the retaliatory action occurred close in time to the protected activities; (2) disparate treatment of similarly situated employees; or (3) direct proof of retaliatory animus directed against the plaintiff.  See *Hollander v. American Cyanamid Co., 895 F.2d 80, 85-86 (2d Cir. 1990)*;

*Philippeaux v. Fashion Inst. of Tech., 1996 U.S. App. LEXIS 33507, 3-4 (2d Cir. N.Y. Dec. 23, 1996)*; *Cannizzaro v. Principi, 2005 U.S. Dist. LEXIS 4819 (E.D.N.Y. Jan. 6, 2005)*; *Tekula v. Bayport-Blue Point Sch. Dist., 295 F. Supp. 2d 224, 231 (E.D.N.Y. 2003)* (quoting *McNair v. N.Y. City Health and Hosp. Co., 160 F. Supp. 2d 601, 604 (S.D.N.Y. 2001)*).

The causal connection needed for proof of a retaliation claim "'can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.'" *Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996)* (quoting *Manoharan v. Columbia University College of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988)*).  In *Reed*, 95 F.3d at 1178 the requisite connection "was shown . . . by, among other things, evidence that the time between the plaintiff's initial complaint and her discharge was a mere twelve days."(upholding findings in favor of the plaintiff). In *Quinn v. Green Tree Credit Corp., 159 F.3d at 769*, the Second Circuit held that it was error to grant summary judgment dismissing the plaintiff's retaliation claim for lack of evidence of a causal connection where her "discharge came less than two months after she filed a complaint with [defendant's] management and just ten days after she filed a complaint with the [state division of human rights]." See also *Cifra v. GE, 252 F.3d 205 (2d Cir. N.Y. 2001)*.

### 1) Plaintiff has provided sufficient evidence to show that a causal connection existed between the protected activity and the adverse employment action

a) Prior to filing his claim of discrimination against Defendant Principal Daysi Garcia, Plaintiff had no critical letters saved for one signed under protest written to his file.[1]

---

[1]Dionne Jaggon admitted that the critical letters she wrote about Mr. Phillip prior to her becoming an Assistant Principal, did not belong in his file. Jaggon dep., p. 58. (April 20, 2010)

b) After he filed his charge of discrimination, Plaintiff was written up twenty times. The striking difference in the sheer number of write-ups plaintiff received after engaging in protected activity supports an inference that the numerous write-ups were caused by retaliatory animus. *Moore v. City of Philadelphia, 461 F.3d 331, 352 (3d Cir. Pa. 2006)* ( employee was subject to three sick-checks in his first five months of medical leave; after filing a lawsuit alleging discrimination, he was subject to sick-checks every other day; the "striking difference" in the application of the sick-check policy "would support an inference that the more aggressive enforcement "was caused by retaliatory animus."). Those letters were then used to support Plaintiff's end of year U-rating.

c) In addition Plaintiff never received an unsatisfactory rating in his four years of teaching prior to his filing a charge of discrimination against Defendants. After he filed his charge of discrimination with the EEOC in February of 2007, and within two weeks after Defendant Garcia learned of it, Garcia formally observed Plaintiff on March 19, 2007 and gave him an unsatisfactory rating. The fact that the protected activity was closely followed in time by the adverse action, supports an inference that the U-rating was caused by retaliatory animus.

d) Further, in the letter Garcia wrote, supporting her action in sending Phillip for a psychiatric examination, in the very first paragraphs listing her reasons for her request, Defendant Garcia clearly states that Phillip's adverse reactions include false accusations of discriminatory, prejudice and racist remarks and/ or actions.  See undated document from Garcia entitled Report of Reasons for requesting Medical Examination of Employee, Ofodile Exh. 17. This at minimum raises an inference that her referral of Phillip to a psychiatrist was motivated by retaliation.

e). Finally,  Garcia immediately took over Plaintiff's supervision after receiving notice of his charge of discrimination while Jaggon continued to supervise all other in his 5th Grade Class.

### 2) Plaintiff has provided sufficient
### evidence to show that Defendants' reasons were pretext

Evidence of pretext may include, among other things, that (1) the Plaintiff's harasser generated much of the evidence supporting the non-retaliatory-justification, see *Quinn v. Green Tree Credit Union Corp., 159 F.3d 759, 770 (2d Cir. 1998)*; (2) evaluations of Plaintiff post dating the protected activity contradict earlier evaluations, See *Treglia v. Town of Manlinus, 313 F.3d 713, 722 (2d Cir. 2002)* or, (3) through the differences in treatment between him and those not in a protected group.  Here, the Assistant Principal Dionne Jaggon continued to supervise and evaluate other 5th Grade teachers but Principal Garcia, who Plaintiff complained discriminated against him decided to take over and evaluate him personally.  Jaggon's dep., p. 90-91.  Garcia at the time was supervising grades, two and three, but personally evaluated and supervised Plaintiff after he engaged in protected activity.

Defendant Principal Garcia generated most of the negative evaluations of Plaintiff and the daily letters to his file. Further, the evaluations of Plaintiff post dating his filing of discrimination charges with the EEOC contradicted the earlier satisfactory evaluations Plaintiff received prior to filing his charge of discrimination.  The McDonnell Douglas formula does not compartmentalize the evidence so as to limit its use to only one phase of the case. The plaintiff's evidence might serve both to establish a prima facie case and discredit a defendant's explanation. *Dillon v. Coles, 746 F.2d 998, 1003 (3d Cir. 1984)*.

Therefore, Plaintiff has presented sufficient evidence to establish that there was a causal connection between his protected activity and Defendants retaliatory actions, and Plaintiff has established that Defendants reasons for the numerous unjustified write-ups, and U-rated observations were pretext.

## II. HOSTILE WORK ENVIRONMENT

### Plaintiff has provided sufficient evidence to show that Defendants' created a hostile work environment

Whether an environment is "hostile" or "abusive" can be determined only by looking at the totality of the circumstances.  These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it is unreasonably interferes with an employee's work place.  *Harris v. Forklift Systems, Inc., 510 U.S. 17*; *Andrews v. City of Philadelphia, 895 F.2d at 1485*.

 In hostile work environment claims, the fact finder should not necessarily examine each alleged incident in a vacuum.  What may appear to be a legitimate justification for a single incident of alleged harassment may look pretexual when viewed in the context of several other related incidents.  See *Andrews v. City of Philadelphia, 895 F.2d at 1485*.

A jury could infer that Plaintiff was subjected to a hostile work environment.  See. *Hughes v. United Parcel Service, Inc., 2004 NY Slip Op 51008U; 798 NYS2d 344; 2004 NY Misc. LEXIS 1552*; *Svenningsen v. The College of Staten Island, 2003 U.S. Dist. LEXIS 25816*;

22

*National R.R. Passenger Corp., v. Morgan, 536 U.S. 101, 122 S.Ct. 2061 (2002)*; *Gregary v. Daly, 243 F.3d 687, at 694-95 (2d Cir. 2001)*; *Andrews v. City of Philadelphia, 895 F2d at 1485*.

In Hughes v. United Parcel Service, Inc., supra, the Court held allegations that the complaining employees were berated and harassed on a regular basis, regularly humiliated by supervisors, and treated differently than his Caucasian counterparts stated enough facts to withstand a motion for summary judgment on the stated Plaintiff's claims of being subjected to a hostile work environment and the other plaintiff who alleged that he was "ostracized", "not kept in the loop", "kept out of meetings" and treated differently than his White counterparts also asserted enough facts to survive summary judgment.  In *Svenningsen v. The College of Staten Island, supra*, the Court held that "the incidents comprising a hostile work environment claim need not make reference to any trait or condition on the basis of which the discrimination has occurred, so long as the incidents can reasonably be interpreted as having taken place on the basis of that trait or condition."

Plaintiff was subjected to a hostile work environment on the basis of his race when he was subjected to a series of abusive or hostile incidents, including (1) Garcia telling Plaintiff that she would be a slave driver when he came back to school from vacation (2) Principal Garcia not following protocol with regard to a complaint against plaintiff; (3) Principal Garcia giving Plaintiff and Lucienne Mohammed short notice to prepare for a pre-observation meeting; (4) the duties Garcia assigned to Plaintiff in connection with his administrative internship; (5) Principal Garcia beckoning Plaintiff with a demeaning hand gesture; (6) assigning Plaintiff a class with 25 "at risk" students, and offering him no assistance; (7) accusing Plaintiff of leaving his students unsupervised; (8) segregating Plaintiff and Lucienne Mohammed the black fifth grade teachers,

23

from other non-black fifth grade teachers, (9) Garcia excluding Plaintiff and Lucienne

Mohammed from staff luncheon; (10) Principal Garcia not watching Plaintiff's student perform

during a cultural day, and (11) Garcia destroying documents from Plaintiff's personnel files.

Plaintiff contends that on June 28, 2005, Defendant Garcia told him that she would be a

slave driver when he returned back to school.  Giving the fact that Plaintiff is of African descent

and in all likelihood a descendant of enslaved Africans, an inflammatory comment such as this

one would most certainly create a hostile working environment for Plaintiff.  The fact that Garcia

denies making such a statement only raises a material issue of fact for summary judgment

purposes.

With respect to Plaintiff's claims that Garcia did not follow protocols with regards to

students complaining about the actions of a teacher, Garcia herself admitted in her deposition

that her usual policy is to check with the teacher (Garcia's dep., 128).  Therefore Plaintiff did not

allude to a vague policy as defendants contend in the memo of law and an issue of fact is raised

as to whether Defendant Garcia followed her own policy in the instance where a student

complained about Plaintiff.

In regards to Garcia giving Plaintiff short notice to prepare for a pre-observation meeting,

Plaintiff is not the only teacher of African descent to contend this.  Lucienne Mohammed who

also complained that Principal Garcia discriminated against her as well as Mr. Phillip also makes

the very same contention that Principal Garcia gave her and Phillip short notice to prepare for a

pre-observation meeting.  See Mohammed's complaint.

With regards to the duties that was given to Plaintiff in connection with his administrative

internship, Plaintiff contended that when he asked Garcia if he could obtain the internship she

24

agreed and reneged on her agreement.  Plaintiff also contended that the only reason Garcia

permitted him to do the internship was because Michelle Brower the union rep at the time, told

Garcia that she could be sued for discrimination (Phillip's dep., p. 106-108).

        In addition, Plaintiff contends that Defendant Garcia gave him duties that would not

allow him to complete his administrative internship.  What Plaintiff needed to complete his

internship was to know how a school budget was put together, he needed experience in

conducting professional development, and he needed experience in collecting and analyzing

school data, looking at school testing, and similar experiences that brought in intern in direct

contact with his colleagues.  (Phillip Tr. 81, 88).  While Garcia assigned other interns those

duties (Grander became a math coach, Glash writing instructor, and Rosa an intervention teacher)

Phillip Tr., p. 88, she assigned Plaintiff yard duty, bus duty, and lunch duty.  She did not assign

the other interns yard duty, bus duty, and lunch duty until after Plaintiff filed a complaint with

OEO in December of 2006. (Phillip Tr., p. 90).

        Although Plaintiff ultimately completed his internship, it was due largely to Plaintiff's

creativity in describing his internship experience.  Phillip Tr., p. 93.  And Plaintiff contends that

although Assistant Principal Mendes was the person who mentored and evaluated him, whatever

she wrote in the evaluation, she was told to write and rewrite until it met Garcia's satisfaction.

Phillip Tr., p. 95.  All this raises in issue of fact with regards to whether Garcia treated Plaintiff

in such a manner because of his race, especially in light of Garcia's comments that she was going

to be a slave driver when Plaintiff returned to school in the fall.

        In regards to Principal Garcia beckoning Plaintiff with her fingers in a demeaning way as

opposed to calling Plaintiff by his proper name, and Garcia inserting her index finger into her

25

mouth while Plaintiff was singing the national anthem, Plaintiff is not required to show that Principal Garcia did not beckon any other teacher with her hands, or that other people witnessed her making an disgusting gesture in reference to Plaintiff singing as Defendants contend. Instead, Plaintiff is contending that this was another small part in which Principal Garcia subjected him to a hostile work environment on the basis of his race. These incident occurred in an overall context in which Principal Garcia harassed Plaintiff. In hostile work environment claims, the fact finder should not necessarily examine each alleged incident in a vacuum. See *Andrews v. City of Philadelphia, 895 F.2d at 1485*.

The incident in which Defendant Garcia placed 25 at risk students into Plaintiff's class and did not give Plaintiff an assistant was also a part and parcel of Garcia's harassment of Plaintiff. Plaintiff asked for assistance in the sense that he wanted an assistant teacher to assist him with those students. Plaintiff also testified that a fellow teacher named James Caulfield was given an assistance although the number of students he had in his class was less than the number of students Plaintiff had in his. Garcia's denials only raises an issue of fact for the jury to decide.

Plaintiff's contention that he was segregated with the only other Black Caribbean teacher teaching the fifth grade, is supported by the fact that Lucienne Mohammed the other Black Caribbean teacher that he was referring too, has also filed a charge of discrimination and hostile work environment, and contends that she was subjected to being separated from other fifth grade teachers. The contention that plaintiff and other teachers of color were not invited to a luncheon, is supported by Mohammed's complaint, as well as the fact that Mr. Narine has testified that he was not invited to the luncheon.

26

With respect to the cultural day incident, Defendant once again attempt to analyze the incident within a vacuum.  The incident occurred during the time that Plaintiff was subjected to a hostile work environment by Principal Garcia on the basis of his race.  The fact that Principal Garcia stayed for Mrs. Mohammed's children's performance is irrelevant.

With regards to Defendant Garcia shredding documents from Plaintiff's personnel files, after Plaintiff had filed a charge of discrimination with the OEO's office in December, was intimately connected with Garcia's discriminatory actions.  Garcia shredded the files precisely because it could have been used to support Plaintiff's charge of discrimination with his OEO's office.

With regards to the book "the Cay", Plaintiff has addressed this argument in his fact section dealing with this subject.

### III. RETALIATORY HOSTILE WORK ENVIRONMENT

**1) Plaintiff has provided sufficient evidence to show
that Defendants subjected him to a retaliatory hostile work environment**

In order to establish a prima facie case of retaliatory hostile work environment, a plaintiff must demonstrate (1) participation in a protected activity known to the defendant; (2) a materially adverse action that might dissuade a reasonable worker from making or supporting a charge of discrimination; and (3) a causal connection between the protected activity and the materially adverse employment action.  *Burlington N. and Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006)* (clarifying that the second prong of a prima facie case of retaliation can be satisfied by any "materially adverse" actions and not only by materially adverse employment actions); see also *Carmellino v. Dist. 20 of N.Y. City Dep't of Educ., No.*

27

*03-cv-5942, 2006 U.S. Dist. LEXIS 63705 , 2006 WL 2583019, at \*5 (S.D.N.Y. Sept. 6, 2006)*
(stating that "[t]he rationale of Burlington Northern applies to . . . ADEA retaliation claims").

As established in Plaintiff's retaliation claim, Plaintiff engaged in protected activity when
he filed a charge of discrimination with the EEOC, Defendants admitted that they were aware of
his protected activity, and Defendants engaged in materially adverse actions by sending 20
critical letters to Plaintiff's files, giving him two U-ratings on his observations, and an end of
year U-rating.

With respect to causation, Plaintiff has shown that after Defendant Garcia was notified of
Plaintiff's filing of a charge of discrimination with the EEOC's office, Defendant Garcia wrote
no less than twenty critical letters to Plaintiff's files, on average one letter a week, from March
2007 to June 2007.   In addition, to writing these critical letters, Garcia subjected Plaintiff to two
additional observations one conducted by herself and another conducted by Martha Torres
Rodriguez.  One U-rating followed within two weeks of Defendants becoming aware of
Plaintiff's protected activity.  Garcia also referred Plaintiff for a medical observation, and gave
Plaintiff an overall U-rating for the school year.  Prior to filing a charge of discrimination,
Plaintiff only had one letter to his file from Defendant Garcia, all the way back in the fall of
2006.

The other letters that Defendants attempt to pass off as letters critical of Plaintiff's
teaching performance, namely the Kaplan Pacing Program letter, and the letters from Match
Coach Ms. Jaggon, should not be considered.  The Kaplan Pacing letter that was written to
Plaintiff's file was written to the files of all fifth grade teachers in 2007, despite the fact that no
teacher in P.S. 65 (3rd and 4th grade included) completed their pacing program, and therefore it

28

can hardly be counted as supporting Defendants theory of Plaintiff's inability to teach.  The

letters written by Ms. Jaggon that were critical of Plaintiff were not written to Plaintiff's files

since Ms. Jaggon a highly inexperienced math coach[2] was not an Assistant Principal at the time.

Therefore, by demonstrating that prior to filing his charge of discrimination, Plaintiff only

had one critical letter written to his from Principal Garcia, and after filing his charge of

discrimination, he had twenty critical letters written to his file, alongside two observations that

resulted in U-ratings, and an overall end of year U-rating evaluation, despite the fact that Plaintiff

never received U-ratings before, Plaintiff has shown sufficient facts to support his contention that

Defendants subjected him to a retaliatory hostile work environment, and he has met the causation

requirement.

### 2) Pretext

Simply by showing strong temporal evidence, the U-rated observation Plaintiff received

by Principal Garcia two weeks after he engaged in his protected activity, Plaintiff has shown that

Defendants explanation is pretext.  *Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 180 (2d.

Cir. 2005)*  (holding that strong temporal evidence alone is sufficient to overcome defendant's

nondiscriminatory reason for adverse action); *Khan v. HIP Centralized Lab. Servs., 2006 U.S.

Dist. LEXIS 19641 (E.D.N.Y. Mar. 27, 2006)*.

### IV. DISPARATE TREATMENT

Under the burden-shifting analysis outlined in *McDonnell Douglas Corp. v. Green, 411

U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*, a plaintiff first must establish a prima facie

---

[2]Jaggon admitted that she had no experience in teaching math at the time Garcia
appointed her math coach.

case of discrimination based on race. See *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)*; *McDonnell Douglas, 411 U.S. at 802*. If he does so, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the employee's dismissal. See *McDonnell Douglas, 411 U.S. at 802*.  If such a reason is proffered, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. See id. at 804; *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)*; *Hargett v. National Westminster Bank, USA, 78 F.3d 836 (2d Cir. N.Y. 1996)*; *Fisher v. Vassar College, 114 F.3d 1332, 1336 (2d Cir. 1997) (en banc), cert. denied, 522 U.S. 1075, 139 L. Ed. 2d 752, 118 S. Ct. 851 (1998)*.

To meet the burden of production required for a prima facie case of discrimination, a plaintiff must show that he (1) is a member of a protected class; (2) he was qualified for his position; (3) he was subjected to an adverse employment decision; and that (4) the adverse employment decision occurred under circumstances giving rise to an inference of discrimination on the basis of his membership in the protected class.  See *St Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993)* The burden a plaintiff, alleging that he was discriminated against by his employer, carries to survive a summary judgment motion at the prima facie stage is a minimal one. Id.

In this case, Defendants agree that Plaintiff can establish the first three elements of his prima facie case, disputing only whether the adverse employment decision took place under circumstances giving rise to an inference of discrimination.

**1) Plaintiff has provided sufficient evidence to show**

30

**that adverse employment decisions taken by Defendants took
place under circumstances giving rise to an inference of discrimination**

A plaintiff may raise such an inference of discrimination by showing that the employer

subjected him to disparate treatment, that is, treated him less favorably than a similarly situated

employee outside his protected group. See *International Bhd. of Teamsters v. United States, 431*

*U.S. 324, 335 n.15, 52 L. Ed. 2d 396, 97 S. Ct. 1843 (1977)*; *Graham v. Long Island R.R., 230*

*F.3d 34, 38-39 (2d Cir. N.Y. 2000)*; *Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 95 (2d*

*Cir. 1999)*(inference of discrimination arises when individual of one race is treated less favorably

than those of another race who are similarly situated); *Shumway v. United Parcel Serv., Inc., 118*

*F.3d 60, 63 (2d Cir. 1997)* (woman may prove inference of discrimination by showing similarly

situated man treated differently); *Montana, 869 F.2d at 106 (*inference of discrimination arises

when female employees are treated less favorably than comparable male employees).

Here Plaintiff has provided sufficient evidence to show that his termination, being sent to

the rubber room and subsequently being terminated by the department of education as a result of

his Visa being revoked was done by Defendants under circumstances giving rise to an inference

of discrimination.  In the case of Plaintiff's termination, Plaintiff was terminated for

discriminatory as well as retaliatory reasons.

Plaintiff was terminated from his position as a  teacher in P.S. 65in an atmosphere in

which nearly all African American teachers, or teachers of African Descent at P.S. 65 were

terminated from their positions as teachers.  If one looks at document Bate numbered 001543,

entitled PS 65 Ethnicity Breakdown 2003-2007 Ofodile Aff., Exh. 28, a snapshot shows that in

2007 the only teacher "of color" were Ms. Mohammed , Mr. Phillip (Plaintiff), Ms. A. Marrero,

Mr. Narine, and Ms. Jaggon (who was a math coach turned Assistant Principal, not a teacher).[3] The teachers of color who had already been removed include, Ms. Roy, Ms. Kahn, Ms. Fearon, Ms. Bel-Farmer, Ms. Lacy and Ms. Greene.  At the conclusion of the 2007 year, Ms. Mohammed, Mr. Phillip (Plaintiff), and Ms. A. Marrero were terminated as teachers at P.S. 65. Mr. Narine, and Ms. Jaggon were the only teachers of color left standing, and Mr. Narine is not of African Descent but instead he is West Indian or Carribean from East Indian descent. Therefore the circumstances under which Plaintiff's job was terminated does give a rise to an inference of discrimination, and Plaintiff has provided sufficient facts (document bate-numbered D001543 and Phillip Trosition testimony) to raise an issue of fact in regards to the inference of racially discriminatory circumstances under his position was terminated.

Further Ms. Mohammed and Ms. A. Marrero filed a charge of discrimination against Defendant Garcia with Defendants' OEO office.  See Marrero's complaint to OEO's office, doc. Bate-numbered 000624, Ofodile's Aff., Exh. 30, and Mohammed's Complaint to OEO's office, Ofodile's Aff., Exh. 29.  Ms. Mohammed also filed a lawsuit against Defendants for racial discrimination.  A letter by Xoria Rordame in support of Asha Marrero's complaint to the Defendants' OEO office (bate numbered D000666) supports Plaintiff's contention that he was terminated under circumstances giving rise to an inference of discrimination.  Letter from Rordame, undated, Ofodile's Aff., Exh. 30.  The letter states how Defendant Garcia told Rordame to keep her distance, "don't get to close" from Asha, and that Asha is a negative person.  It shows how Defendant Garcia attempted to use Rordame to keep tabs on Asha, and

---

[3]The list shows a Mr. Or Ms. Barnes and a Mr. Or Ms. Hunt who were labeled as substitute teachers and were newly hired.  Hunt was hired in or around March of '07 after Defendant Garcia was sued for racial discrimination.

was always attempting to "catch" Asha doing something wrong.  And it states how Defendant

Garcia resorted to fabricating false accusations against Marrero in order to terminate Marrero's

employment.  Id.

The U-ratings that were given to Plaintiff, and the twenty letters written to Plaintiff's files

after March, 2007 that supported Defendants' determination to terminate Plaintiff's employment,

were given to Plaintiff in retaliation for Plaintiff's complaint of being discriminated against and

will be dealt with in the retaliation section of Plaintiff's argument.

Another circumstance that raises the inference of racial discrimination includes the fact

that only fifth grade teachers received letters to their files dated January 2, 2007, regarding their

incomplete use of the Kaplan ELA-Advantage Pacing Calendar.  See, *Treglia v. Town of*

*Manlius, 313 F.3d 713, 720 (2d Cir. N.Y. 2002)* citing *Morris v. Lindau, 196 F.3d 102, 110 (2d*

*Cir. 1999)* (Lesser actions such as negative employment evaluation letters may also be

considered adverse).  This raises the inference of discrimination, because all of the fifth grade

teachers were of color and they were the only ones to receive the letter.  The third and the fourth

grades in PS 65 had no teacher of color or of African descent and they received no letters to their

files despite the fact that their files were also incomplete.

Other circumstances that raises the inference of racial discrimination include (1) Garcia

telling Plaintiff that she would be a slave driver when he came back to school from vacation, (2)

Principal Garcia giving Plaintiff and Lucienne Mohammed short notice to prepare for a pre-

observation meeting, while giving Latino and White teachers more time; (3) Principal Garcia

beckoning Plaintiff with a demeaning hand gesture; (4) Defendant Garcia assigning Plaintiff a

class with 25 "at risk" students, and offering him no assistance, in comparison to offering a

White male teacher assistance when he had 17 of the same students in the previous year; (5) accusing Plaintiff of leaving his students unsupervised, while not writing White and Hispanic teachers who left their children unsupervised; (6) segregating Plaintiff and Lucienne Mohammed the black fifth grade teachers, from other non-black fifth grade teachers, (7) excluding Plaintiff and Lucienne Mohammed from staff luncheon; and (8) Garcia destroying documents from Plaintiff's personnel files.

Defendants point out in their memorandum that Plaintiff referral for a medical evaluation by Defendant Garcia was for discriminatory reasons.  Plaintiff's referral for a medical evaluation will be better addressed in Plaintiff's retaliation claims.

**2) Plaintiff has provided sufficient
evidence to show that Defendants' reasons were pretext**

In order to demonstrate that the employer's stated non-discriminatory reasons for the allegedly discriminatory action are pretextual, "[a] plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Johnson v. County of Nassau*, *480 F. Supp. 2d 581, 594 (E.D.N.Y. 2007)* (quoting, *Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 203 (2d Cir. 1995)*).  A discrimination claimant may show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Johnson v. County of Nassau*,

*480 F. Supp. 581, 594 (E.D.N.Y. 2007)* (quoting, *Bombero v. Warner-Lambert Co.*, *142 F. Supp.2d 196, 203 n.7 (D. Conn. 2000)*).

Proof of pretext may include (1) suspicious timing, See *Edwards v. William Raveis Real Estate, Inc., 2010 U.S. Dist. LEXIS 99758 (D. Conn. Sept. 21, 2010)*, (2) behavior toward or comments directed at other employees in the protected group, *See Ali v. Tribune Entertainment Co., 1996 U.S. Dist. LEXIS 9628 (S.D.N.Y. July 9, 1996)*, or (3) evidence that similarly situated employees outside the protected class received systematically better treatment. *Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000)*; *Hargett v. National Westminster Bank, USA, 78 F.3d 836 (2d Cir. N.Y. 1996)*; *Anderson v. Hertz Corp., 507 F. Supp. 2d 320, 327 (S.D.N.Y. 2007)*.

Here, Plaintiff can demonstrate that Defendants asserted reasons for terminating Plaintiff's employment and subjecting Plaintiff to disparate treatment on the basis of race are pretext.

By offering evidence of Garcia's behavior towards other members of Plaintiff's protected class, namely that Garcia terminated the employment of all the Black teachers at P.S. 65k, and all but one teacher of color, Mr. Narine, Plaintiff has demonstrated that Defendants treated other members of Plaintiff's protected class differently, and treated members outside of Plaintiff's protected class more favorably and it casts doubt on Defendants explanation for terminating Plaintiff's employment, thereby raising an issue of fact of whether their explanation is pretext.

Further, the fact that the last two three remaining teachers of color (Plaintiff, L. Mohammed, and A. Marrero) who were subsequently terminated or sent to the rubber room in 2007, filed charges of discrimination with Defendants OEO's office or with the EEOC, supports the theory that Defendants explanation for firing Plaintiff was pretext.  In addition with regards to

35

Asha Marrero, a letter written on her behalf by Xoria Rordame, demonstrates that Garcia was willing to stoop as low as fabricating charges against and spying on Marrero in order to oust her from P.S. 65.  If Garcia was willing to do so in Marrero's case, Plaintiff is contending that Garcia did the same in his case.

In addition by showing that Garcia chose only to have letters be sent to fifth grade teachers all but one of which were of color, despite the fact that all teachers at P.S. 65 failed to complete the Kaplan Pace calendar also shows that Defendant treated other members of Plaintiff's class differently, and treated members outside of Plaintiff's class more favorably.

Therefore Plaintiff has demonstrated sufficient facts to raise an issue of whether Defendants explanation for their termination of Plaintiff was pretext for racial discrimination.

### V. Principal Garcia Is Not Entitled to Qualified Immunity

The defense of qualified immunity in a discrimination claim, alleging that Plaintiff was discriminated against and retaliated against when he complained about discrimination based on race or national origin, asserted under Title VII, New York State Human Rights Law section 296 and New York City Administrative Code, it is respectfully, submitted, is totally without merit and not made in good faith. First and foremost, claims asserting discrimination are not constitutional rights, but statutory rights and therefore the constitutional analogy is irrelevant and inapposite. Secondly, the Civil Rights Act of 1866, 42 U.S.C. § 1981 forbade race discrimination almost one and a half centuries ago, and the law was interpreted and has been judicially interpreted and also legislatively amended to prohibit retaliation for any good faith complaint of discriminatory treatment for decades now. Therefore, there can be no argument about not knowing that race discrimination or retaliation for complaining about race discrimination is

36

forbidden by law. Title VII of the Civil Rights Act of 1964, 42 U.S. C. § 2000-e, et seq., forbade race, color and national origin discrimination since 1964. State and City laws forbidding discrimination has been in existence for many decades. No court has in recent memory granted qualified immunity for a discrimination claim to an individual. The claim for qualified immunity for a discrimination claim has not been made in legal arguments in recent memory. Liability is primarily imposed on the employers under all the laws. Furthermore, under Title VII, there is no individual liability. Under the Executive Law, it is doubtful that the individual defendants are liable. However, both under § 1981 of the Civil Rights Act of 1866 and under the New York City Administrative Code, the individuals defendants are personally liable.

Plaintiff had a clearly established right to be free from employment related disparate treatment and retaliation for engaging in protected speech.  Defendants violated that clearly established right in subjecting Plaintiff to disparate treatment on the basis of his race, retaliation for engaging in protected activity and a hostile work environment.

**<u>CONCLUSION</u>**

Based on the forgoing, Plaintiff request that the Court denies defendant's Motion in its entirety.


Dated:  Brooklyn, New York
       October 26, 2010

                        Respectfully Submitted:

                        OFODILE & ASSOCIATES, P.C.
                        *Attorneys for Casey Phillip*

By:         S/b
              ANTHONY C. OFODILE, ESQ.
              Abdul Washington, Esq.

37

498 Atlantic Avenue
Brooklyn, New York 11217