UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------x

CASEY PHILLIP,

                Plaintiff,                             Memorandum and Order

                                                      09 Civ. 442

         - against -

THE CITY OF NEW YORK, et al.

                Defendants.

-------------------------------------------------------x

GLASSER, United States District Judge:


       Plaintiff Casey Phillip ("plaintiff" or "Phillip"), a former teacher with the New York City Department of Education ("DOE"), filed this action against the City of New York ("NYC"), the DOE, and former supervisors, Principal Daysi Garcia and Local Instructional Superintendent, Martha Rodriguez-Torres, in their individual capacities (collectively, "defendants"). Plaintiff alleges that, based on his race or national origin as a Black man of Caribbean descent and Antiguan citizenship, defendants subjected him to discrimination, a hostile work environment, and retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 200e, et seq. ("Title VII"); the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296, et seq. (McKinney 2010); and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-502. Before the Court is the defendants' Motion for Summary Judgment. For the following reasons, defendants' motion is granted in part and denied in part.

## BACKGROUND

The following facts are undisputed, unless otherwise noted. From 2003 to 2007, plaintiff was employed as a teacher at Public School 65 ("P.S. 65") in Brooklyn, New York. Defendants' Local Rule 56.1 Statement ("Defs.' R. 56.1") ¶¶ 3-5. Plaintiff self-identifies as Black, of Caribbean descent, and is a citizen of Antigua. Id. ¶ 2. Daysi Garcia ("Principal Garcia") was appointed Principal of P.S. 65 in August, 2004. Id. ¶ 6. Principal Garcia self-identifies as Hispanic of Caribbean (Dominican) descent. Id. ¶ 7. Superintendent Martha Rodriguez-Torres ("Superintendent Rodriguez-Torres") self-identifies as Hispanic. Declaration of Jane E. Andersen dated July 21, 2010 ("Andersen Decl."), Ex. V, at 10.

## I.   Plaintiff's Alleged Discrimination and Hostile Work Environment

Plaintiff alleges that beginning in November 2004 and for several years thereafter, defendants discriminated against him on the basis of his race, color, and national origin, creating a hostile work environment, and then retaliated against him when he complained of this discrimination. In support of his claims, plaintiff alleges the following acts.

### A. 2004-2005 School Year

In November, 2004, Principal Garcia visited plaintiff's classroom and observed him teaching. During the observation, Principal Garcia positioned her chair so that she had her back to him, facing the children. Am. Compl. ¶ 17; Defs.' R. 56.1 ¶¶ 107-108. Plaintiff alleges that in his ten years of teaching, no observer ever sat with their back to him and that non-Black and non-Caribbean colleagues told him Principal Garcia did not sit this way during their observations. Am. Compl. ¶ 17.

In the fall of 2004, a parent complained to Principal Garcia about comments plaintiff made to his students.  Id. ¶ 18.  Plaintiff alleges that Principal Garcia failed to follow protocol when she did not call him into her office immediately, to give him an opportunity to respond to the parent's complaint.  Id.  Plaintiff alleges that, in contrast, "she did follow protocol in handling complaints about his non-Black, non-Caribbean colleagues."  Id.

Plaintiff alleges that on June 28, 2005—the last day of the school year—Principal Garcia made a "racist comment" when she told plaintiff, "When you return in September, I'll be a slave driver."  Id. ¶ 20.

Plaintiff was formally observed by Principal Garcia twice during the school year: a Literacy class on October 21, 2004 and a Math class on February 18, 2005.  Andersen Decl. Ex. E & F.  Both times, Garcia ranked plaintiff "satisfactory."  Id.  Plaintiff also received an overall rating of "satisfactory" from Principal Garcia on his 2004-2005 annual professional performance review.  Affirmation of Anthony Ofodile dated October 26, 2010 ("Ofodile Aff."), Ex. 1.

## B. 2005-2006 School Year

Plaintiff alleges that in October or November of 2005, Principal Garcia treated him and another Black, Caribbean teacher, Lucienne Mohammed ("Ms. Mohammed"), differently from two Hispanic teachers.  Plaintiff alleges that Principal Garcia gave the Black, Caribbean teachers only one weekend to prepare a lesson plan and required them to adhere to a ten-page guideline document while the Hispanic teachers were given two weeks to prepare and were not given the ten-page document.  Am. Compl. ¶ 21

Plaintiff alleges that in the spring of 2006, Principal Garcia also discriminated between him and three female teachers, two of whom were White and one of whom was Hispanic.  Id. ¶ 22.  All four teachers were studying to be school administrators and performed internships under Garcia's mentorship to fulfill certain skill requirements, known as "competencies."  Id.  Plaintiff alleges that Principal Garcia attempted to rescind her agreement to mentor him but did not rescind her agreement with the other three teachers.  Id.  Plaintiff also alleges that during the internship Garcia discriminated against him by assigning him "duties that had nothing to do with the requirements of his internship and that were actually the duties of an aide, not a teacher or an administrator."  Id.  In contrast, the three female teachers were given tasks "that allowed them to actually meet the requirements of their internships."  Id.  Consequently, plaintiff alleges he was forced to seek mentoring from Assistant Principal Yvette Mendez ("AP Mendez") instead.  Id. ¶ 23.

Plaintiff alleges that on March 2, 2006 and then several times thereafter, Principal Garcia "beckoned to Plaintiff with a demeaning hand gesture," using her index and middle finger, rather than calling him by his name.  Id. ¶ 24.  Similarly, plaintiff alleges that Garcia embarrassed him one day when she inserted "her index finger into her open mouth" as though vomiting when plaintiff sang off-key while leading students in the national anthem.  Id. ¶ 32.  Plaintiff alleges she did not make these kinds of gestures to his non-Black, non-Caribbean colleagues.  Id. ¶¶ 24, 32.

Plaintiff was formally observed by AP Mendez twice during the 2005-2006 school year: a Math class on February 13, 2006 and a Science class on April 11, 2006.  Andersen Decl. Ex. H & I.  AP Mendez ranked plaintiff "satisfactory."  Id.  Principal Garcia gave

4

plaintiff an overall rating of "satisfactory" on his 2005-2006 annual professional performance review.  Id. Ex. J.

### C.  2006-2007 School Year

In September 2006, plaintiff obtained tenure.  Id. Ex. XX.  Plaintiff alleges that during the 2006-2007 school year, Principal Garcia discriminated between him and a White teacher, James Caulfield ("Caulfield"), in the assignment of students.  Am. Compl. ¶ 25.  Plaintiff alleges that Caulfield was given a class of 14-16 fourth grade students, many with behavior and learning problems, and a teaching assistant two full days per week.  Id.  In contrast, when those students advanced to plaintiff's fifth grade class, he was assigned 25 students with behavior and learning problems and was not given a teaching assistant, despite requests for one by plaintiff, AP Mendez, and plaintiff's union representative.  Id.; Ofodile Aff. Ex. 31, at 147-57.

On October 24, 2006, Principal Garcia met with plaintiff and his union representative, Alan Weinstein, to discuss an occasion when plaintiff left students unsupervised.  Andersen Decl. Ex. W.  Plaintiff denies he left the students unsupervised.  Am. Compl. ¶ 26.  Plaintiff alleges that "Garcia was trying to sabotage Plaintiff's career and did not try to reprimand non-Black, non-Caribbean teachers who had actually left their students unsupervised."  Id.

On November 7, 2006, plaintiff attended a Staff Development Day.  Id. ¶ 27. During one training session utilizing the book The Cay,[1] Ilene Brodsky, a literacy coach, asked the plaintiff to read the part of Timothy, a Black West Indian man, because he had

---

[1] Plaintiff mistakenly refers to this book as "The Cays."  See Am. Compl. ¶ 27.  Based on Plaintiff's description and quotations from the book, it is clear he is referring to "The Cay," a young-adult novel about a friendship between a shipwrecked White boy and an older West Indian man who rescues him. See Theodore Taylor, The Cay (1969).

"the right accent."  Id.  The plaintiff found the author's description of Timothy (referred to in the book as "the Negro") and the dialogue, written in a phonetic vernacular, to be "insensitive, demeaning, and humiliating" and refused to read the passage.  Id.  Plaintiff alleges that, Principal Garcia "must have approved and condoned" the use of the book. Id.  Plaintiff also alleges that he saw Principal Garcia sitting in the back of the room with another teacher, smiling, at the time he was asked to do the reading.  Id. ¶ 28.  Similarly, plaintiff alleges that he was the only teacher required to read with his class the young-adult novel, Roll of Thunder, Hear My Cry, a book that repeatedly uses the word "nigger."  Id. ¶ 29.

Plaintiff alleges that for the 2006-2007 school year, Principal Garcia created a segregated lunchroom.  Id. ¶ 30.  Plaintiff and the only other Black, Caribbean teacher were scheduled to a separate lunch period from their two fifth grade colleagues, who were Hispanic and Indian/Guyanese, respectively.  The teachers in third grade and fourth grade, all of whom were White or Hispanic, shared the same lunch periods.

On December 22, 2006, the staff had a luncheon in the school library.  Plaintiff alleges that of the four fifth grade teachers, Principal Garcia only informed Rosa Ruiz, who is Hispanic, about the lunch.  Id. ¶ 31.  The other three teachers, who were Black or dark-skinned, were excluded.

On December 14, 2006, plaintiff requested some documents from his personnel file.  Id. ¶ 34.  On December 22, 2006, his union representative was informed that Principal Garcia shredded various documents from his personnel file, including "[p]laintiff's internship documents and letters of recommendation and commendation." Id.  Plaintiff alleges that Garcia did not shred the documents of any other teachers.  Id.

Finally, plaintiff alleges that when his class performed at a cultural day on June 14, 2006, Principal Garcia, along with four other colleagues, walked out of the performance.  Id. ¶ 33.  Plaintiff alleges that they watched all the other classes perform and returned to the room as soon as his class finished.

During the 2006-2007 school year plaintiff was observed by Dionne Jaggon ("Jaggon"), the school's math coach.[2]  Andersen Decl. Ex. L, at 16, 18-23.  On October 18, 2006, December 19, 2006, and January 16, 2007, Jaggon observed plaintiff teaching math classes.  Id. Ex. N-P.  Jaggon was critical of plaintiff's teaching, finding a number of deficiencies.  Id.  AP Mendez also formally observed Plaintiff teaching a Literacy/Social Studies class on October 3, 2006 and a Math class on January 25, 2007.  Id. Ex. Q & R.  AP Mendez ranked plaintiff "satisfactory."  Principal Garcia formally observed plaintiff teaching a Math class on March 19, 2007.  Id. Ex. S.  Principal Garcia deemed the lesson "unsatisfactory."  On April 16, 2007, Superintendent Rodriguez-Torres observed plaintiff and was critical of plaintiff's planning and teaching.  Id. Ex. T & U.  Plaintiff received an overall rating of "unsatisfactory" on his 2006-2007 annual professional performance review.  Id. Ex. TT.

## II.    Plaintiff's Complaints

### A. The Office of Equal Opportunity

On December 27, 2006, plaintiff filed a complaint with the Office of Equal Opportunity ("OEO") in the DOE, alleging Principal Garcia discriminated against him on the basis of his color, race, and national origin.  Id. Ex. YY.  In a report dated

---

[2] In March 2007, Principal Garcia hired Jaggon, who is Black and of Caribbean descent, to be an Assistant Principal at P.S. 65.  Defs.' R. 56.1 ¶¶ 28, 192, Andersen Decl. Ex. L at 12; Ofodile Aff. Ex. 31 at 191.  Therefore, the Court refers to Jaggon as "AP Jaggon" for those events occurring after her promotion.

February 20, 2007, the OEO found that "the complainant presented no credible evidence that he was discriminated against because of his race" and Principal Garcia "provided credible responses to each of the allegations." Id. Ex. ZZ. Plaintiff's appeal was denied in a decision dated May 4, 2007. Id. Ex. BBB.

### B. The Equal Employment Opportunity Commission

On January 4, 2007, plaintiff submitted an Intake Questionnaire to the Equal Employment Opportunity Commission ("EEOC"). Id. Ex. GGG. On February 7, 2007, plaintiff filed a Charge of Discrimination with the New York State Division of Human Rights and the EEOC against the DOE and NYC, alleging discrimination on the basis of color, race, and national origin. Id. Ex. HHH. Plaintiff submitted an amended charge on October 22, 2007. Id. Ex. III. On December 18, 2008, the EEOC issued a right-to-sue letter to the plaintiff. Id. Ex JJJ. Prior to the commencement of this action, the EEOC did not file any action or enter into any conciliation agreement regarding Phillip's complaint. Am. Compl. ¶ 14.

### III.   Plaintiff's Retaliation Claim

Plaintiff alleges defendants retaliated against him after he filed his OEO and EEOC complaints. This retaliation included more than twenty negative performance evaluations;[3] referring plaintiff for psychological evaluation, Andersen Decl. Ex. CC &

---

[3] See, Andersen Decl. Ex. X (letter from AP Mendez dated Jan 2, 2007 regarding failure to use Kaplan books); id. Ex Z (letter from Principal Garcia dated March 8, 2007 regarding plaintiff's January 8, 2007 grievance); id. Ex AA (memorandum from Principal Garcia dated March 16, 2007 regarding disorderly dismissal of students); id. Ex. S (report of March 19, 2007 observation by Principal Garcia); id. Ex BB (letter from Principal Garcia dated March 30, 2007 regarding unsupervised students and unprofessional behavior); id. Ex. CC (letter from Principal Garcia dated April 13, 2007 regarding March 30, 2007 incident of unprofessional behavior and directing Phillips to submit to psychiatric evaluation); id. Ex. T (report of April 16, 2007 observation by Superintendent Rodriguez-Torres); id. Ex. DD (letter from AP Jaggon dated April 19, 2007 regarding harassment of other teachers); id. Ex. EE (letter from AP Jaggon dated April 20, 2007 regarding multiple instances of unprofessional conduct); id. Ex. FF (letter from AP Jaggon dated April 27, 2007 regarding student discipline and unprofessional conduct); id. Ex. GG (letter

PPP; using "derogatory terms" in reference to plaintiff,  Am. Compl. ¶ 35; and the
instigation of disciplinary charges, Andersen Decl. Ex. UU & VV.  On October 26, 2007,
plaintiff was suspended with pay.  Id. Ex. UU.  Approximately one year later, by a letter
dated October 7, 2008, plaintiff's H-1B visa was revoked on the grounds that he had
been suspended.[4]  Id. Ex. WW.  Without the visa, plaintiff was ineligible to work in the
United States and his employment was terminated.  Defs.' R. 56.1 ¶ 76.

Plaintiff filed additional complaints with the OEO on April 18, 2007, and with the
EEOC on October 22, 2007, alleging he was retaliated against for his first OEO and
EEOC complaints.  Andersen Decl. Ex. CCC & III.  In a report dated May 30, 2007, the
OEO found that the evidence did not substantiate plaintiff's retaliation claims.  Id., Ex.
DDD.  Plaintiff also filed a complaint with the DOE on June 1, 2007 against Principal
Garcia and another teacher, James Caulfield ("Caulfield"), alleging he was harassed and
threatened.  Id. Ex. FFF.  The Office of Special Investigations ("OSI") referred the
investigation to the regional superintendent.  Id. In a decision dated July 9, 2007,
Superintendent Rodriguez-Torres found plaintiff's complaint to be unfounded.  Id.

---

from AP Jaggon dated April 27, 2007 regarding insubordination); id. Ex. LL (letter from Principal Garcia
dated May 4, 2007 requiring plaintiff to submit lesson plans each Monday for review); id. Ex. MM (letter
from Principal Garcia dated May 7, 2007 giving feedback on lesson plans); id. Ex. NN (letter from
Principal Garcia dated May 15, 2007 regarding lesson plans, requiring resubmission); id. Ex. HH (letter
from Principal Garcia dated May 15, 2007 regarding unexcused absence); id. Ex. II (memorandum from
AP Jaggon dated May 16, 2007 regarding classroom observations and plaintiff's inappropriate racial
comments); id. Ex. OO (letter from Principal Garcia dated May 25, 2007 regarding performance
deficiencies and failure to submit lesson plans); id. Ex. PP (letter from Principal Garcia dated May 29,
2007 regarding performance deficiencies and lesson plans); id. Ex. JJ (letter from Principal Garcia dated
June 1, 2007 regarding inappropriate social studies class material); id. Ex. QQ (letter from Principal
Garcia dated June 4, 2007 regarding deficiencies in lesson plans); id. Ex. RR (letter from Principal Garcia
dated June 11, 2007 regarding lesson plans and failure to resubmit); id. Ex. SS (letter from Principal
Garcia dated June 18, 2007 regarding lesson plans); id. Ex. KK (letter from AP Jaggon dated June 27,
2007 regarding insubordination and failure to follow portfolio regulations).
[4] Although hearings were held before an arbitrator, see Andersen Decl. Ex. VV, at 2, the arbitrator did not
render a decision on plaintiff's disciplinary charges prior to the revocation of plaintiff's visa.  Once
plaintiff's visa was revoked, the arbitration became moot and no final decision was rendered on the
merits.  See id. at 4.

## JURISDICTION

This Court has original jurisdiction over plaintiff's Title VII and § 1981 claims, claims arising under federal law. The Court also has supplemental jurisdiction over plaintiff's state law discrimination claims. Federal courts have supplemental jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). A state law claim forms part of the same controversy if the state and federal claim "derive from a common nucleus of operative fact." United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966). Here, the parties and alleged events and injuries that form the basis of plaintiff's federal claims are identical to those that form the basis of plaintiff's state law claims.

## DISCUSSION

### I.  Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As an initial matter, the moving party has the burden of demonstrating that no genuine dispute of material fact exists for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations,

10

stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

Once the moving party has met this burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.'" Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita, 475 U.S. at 586–87 (emphasis in original)). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

The Court is compelled to draw all reasonable inferences in favor of the nonmoving party, Matsushita, 475 U.S. at 586, and a genuine dispute exists if a reasonable jury could find in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). However, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249–50 (citations omitted). "[T]he mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. Id. at 247–48. "Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth 'concrete particulars' showing that a trial is needed." R.G. Grp., Inc. v. Horn &

11

Hardart Co., 751 F.2d 69, 77 (2d Cir. 1984) (quoting S.E.C. v. Res. Automation Corp., 585 F.2d 31, 33 (2d Cir. 1978)).

## II.    Statute of Limitations

In seeking summary judgment, defendants first argue some of plaintiff's discrimination claims are barred by the applicable statute of limitations.  These arguments are without merit.  For the reasons discussed below, the majority of the alleged discriminatory acts are not actionable because they were not "adverse employment actions."  The only actionable act of alleged discrimination is plaintiff's suspension from teaching on October 26, 2007 and subsequent termination.  This act clearly falls within the applicable statutes of limitation, as do all alleged acts of retaliation.[5]  The other alleged discriminatory acts (e.g., derogatory gestures and disparate treatment) though not actionable in themselves, may nevertheless be cited as evidence in support of plaintiff's timely claim (for example, as evidence of pretext) even if they fall outside the statute of limitations.  See Flynn v. N.Y. State Div. of Parole, 620 F. Supp. 2d 463, 483 (S.D.N.Y. 2009) (female parole officer could only recover for discreet acts of discrimination falling within the statute of limitations but time-barred discriminatory acts were still admissible as "background evidence.") (citing Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113, 112 S. Ct. 2061, 153 L. Ed. 2d (2002); Glynn v. Cnty. of Suffolk, 50 F. App'x 58, 58-59 (2d Cir. 2002)).

---

[5] The statute of limitations for plaintiff's Section 1981 discrimination claims is four years, 28 U.S.C. § 1658(a); Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 124 S. Ct. 1836, 158 L. Ed. 2d (2004).  The statute of limitations for plaintiff's NYSHRL and NYCHRL claims is three years.  Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 238 (2d Cir. 2007).  To be timely, plaintiff must file a charge of discrimination with the EEOC (or state or local equivalent agency) within 300 days of the alleged discriminatory act.  See 42 U.S.C. § 2000e–5(e)(1); Hill v. Citibank Corp., 312 F. Supp. 2d 464, 472 (S.D.N.Y. 2004).  This requirement effectively acts as a statute of limitations and therefore plaintiff could not recover under Title VII for acts of discrimination occurring prior to April 11, 2006.

Plaintiff's hostile work environment claims are not subject to these statutes of limitations because "[t]heir very nature involves repeated conduct. . . . The 'unlawful employment practice' therefore cannot be said to occur on any particular day. . . . Such claims are based on the cumulative effect of individual acts. Morgan, 536 U.S. at 115 (citation omitted). For plaintiff's hostile work environment claims, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." Id. at 117.

### III.   Plaintiff's Discrimination Claims Pursuant to Title VII, § 1981 and the NYSHRL

Plaintiff alleges defendants subjected him to discrimination based on his race, color, and national origin pursuant to Title VII and the NYSHRL, and to discrimination based on his race and color pursuant to § 1981.[6]   These claims are analyzed under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). See Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010) (noting the basic analytical framework for claims under Title VII, § 1981, and the NYSHRL is the same).

Under the McDonnell Douglas framework, plaintiff must first establish a prima facie case of discrimination by demonstrating: (1) he is a member of a protected class; (2) he was qualified for his position or was performing his duties satisfactorily; (3) he suffered an adverse employment action; and (4) there is some evidence of a causal connection between his membership in a protected class and the adverse employment

---

[6] Section 1981 does not protect against discrimination based on national origin. Anderson v. Conboy, 156 F.3d 167, 170 (2d Cir. 1998).

action.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).  The demonstration of a prima facie case "in effect creates a presumption that the employer unlawfully discriminated against the employee."  Scaria v. Rubin, 117 F.3d 652, 654 (2d Cir. 1997).  Although the standard to establish a prima facie case is not high, conclusory allegations alone are insufficient to support an inference of discrimination.  Sharif v. Buck, 152 F. App'x 43, 44 (2d Cir. 2005).

After the plaintiff has satisfied this initial burden, the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse employment action.  Patterson v. Cnty. of Oneida, 375 F.3d 206, 221 (2d Cir. 2004).  This showing must be supported by admissible evidence that, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action.  The employer's burden of production also is not a demanding one; they need only offer a non-discriminatory explanation for the employment decision.  Bickerstaff v. Vassar Coll., 196 F.3d 435, 446 (2d Cir. 1999) (citation omitted).

If the employer carries this burden, the burden shifts back to the plaintiff to demonstrate that the legitimate reasons offered by the employer were not its true reasons, but were a pretext for discrimination.  Patterson, 375 F.3d at 222 (citation omitted).  Throughout this analysis, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Texas Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).

### A.  Plaintiff's Prima Facie Case

It is undisputed that plaintiff has established the first two elements of a prima facie claim: he is a member of a protected class because he is a Black man of Caribbean descent and he was qualified, based on his education, past performance, and experience, for his position as a teacher.  Regarding the third element, defendants argue that plaintiff was not subject to an adverse employment action until October 7, 2008 when his work visa was revoked, resulting in the automatic termination of his employment. Defendants argue that because the work visa was automatically revoked and "Principal Garcia or other administrators at P.S. 65 did not have any input in or knowledge of the decision to revoke plaintiff's visa," Defs.' Mem. at 5-6, there can be no inference of discriminatory intent and plaintiff cannot meet the fourth element of a prima facie case.

Defendants' arguments are meritless.  An adverse employment action is one that results in a materially adverse change in the terms and conditions of employment, such as termination, demotion, wage reduction, loss of benefits, or significantly reduced material responsibilities.  Sanders v. N.Y.C. Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004).  Defendants subjected plaintiff to disciplinary action and suspended him from teaching on October 26, 2007.  Plaintiff's suspension from teaching clearly qualifies as a materially adverse employment action.

In support of the inference that his suspension was motivated by animus, plaintiff alleges specific incidents where Principal Garcia made discriminatory comments and gestures toward him and treated him differently from White and Hispanic colleagues. Plaintiff argues that these discriminatory acts lead to the inference that his suspension was motivated by his race, color, or national origin.  The requirements for establishing a

prima facie case are minimal and these specific allegations are sufficient to satisfy the standard.

### B. Defendants Have Articulated a Legitimate Non-Discriminatory Reason for Suspending Plaintiff

Defendants have articulated legitimate, non-discriminatory reason for suspending plaintiff from teaching, supported by admissible evidence.  Defendants claim disciplinary charges were brought and plaintiff was suspended because he "rendered incompetent and inefficient service, was insubordinate, engaged in misconduct and neglected his duties . . . ."  Andersen Decl. Ex. UU.  In support, defendants submit records documenting plaintiff's deficiencies as a teacher during the 2006-2007 school year.  These included: regularly teaching lessons far below grade-level, Ex. NN, PP, RR, SS; preparing inadequate or no lesson plans, Ex. OO; failing to follow the regional pacing calendar or New York City Curriculum Planning Guide, Ex. RR, UU; refusing to attend mandatory teacher meetings, Ex. UU, at 2; and failing to respond to constructive criticism, Ex. RR, SS.  Defendants also provided detailed examples of plaintiff's insubordination and unprofessional behavior towards Principal Garcia and AP Jaggon during the 2006-2007 school year including, among other things, disrespectful comments and letters, refusal to follow instructions, and failure to submit lesson plans when requested.  See Andersen Decl. Ex. Z, CC, EE, FF, GG, & UU.

### C. Plaintiff Has Failed to Show that Defendants' Proffered Reasons are Pretextual

Because Defendants have proffered a legitimate reason for the employment action, any presumption of discrimination ends and plaintiff bears the burden of showing defendants' legitimate reasons were a pretext for discrimination.  In order to

meet this burden, plaintiff has alleged a number of instances in which Principal Garcia treated him in a derogatory manner or discriminated between Black, Caribbean teachers and White or Hispanic teachers.  See Pl.'s Mem. at 33.  For the reasons set forth below, the Court finds plaintiff has failed to "produce evidence such that a rational finder of fact could conclude that the adverse action taken against [him] was more likely than not a product of discriminatory animus."  Leibowitz v. Cornell Univ., 584 F.3d 487, 504 (2d Cir. 2009).

1.   Derogatory Comments & Gestures

Plaintiff alleges that prior to his suspension he was subject to a number of derogatory gestures and comments.  These included: a comment by Principal Garcia in June, 2005 that she would be "a slave driver" the next school year; using her index finger to summon him, in a manner he found insulting; putting her finger in her mouth as though vomiting when plaintiff was singing the national anthem off-key in early 2006; walking out of a performance by plaintiff's students on June 14, 2006; and using "derogatory terms" in her letters to his personnel file.  Plaintiff also alleges that he was humiliated at a staff development day in November, 2006 when he was asked to read the part of Timothy in The Cay.

The Court is not persuaded that a reasonable jury could find that these comments and gestures demonstrate the defendants' proffered reasons are a pretext for discrimination.  Principal Garcia's "slave driver" comment was a stray remark made two years before plaintiff was suspended.  Such stray remarks are insufficient to show pretext.  See Lee v. N. Y. State Dept. of Health, No. 99 Civ. 4859 (RMB) (HBP), 2001 WL 34031217, *19 (S.D.N.Y. Apr. 23, 2001) (Remarks by employer cannot establish pretext

when they are remote in time and unrelated to the challenged adverse employment decision).

Although plaintiff alleged in his complaint that Principal Garcia did not use her index finger to summon non-Black, non-Caribbean teachers, at deposition plaintiff conceded that he did not know if this was true because he never asked other teachers if she gestured to them in this way. Andersen Decl. Ex. B, at 178. As for gesturing while he was singing, plaintiff conceded that he was singing very loudly and off-key and that he assumed this was the reason Principal Garcia made the gesture. Id. at 189. Plaintiff presents no evidence the gesture was related to his protected class. Similarly, plaintiff presents no evidence Principal Garcia left the school performance for any discriminatory reason. Plaintiff never asked her why she left and she watched the performance of Ms. Mohammed's class, another Black, Caribbean teacher. Ofodile Aff. Ex. 31, at 173-74.

The only "derogatory terms" alleged by plaintiff are terms such as "loud, aggressive, threatening, scary" in letters Principal Garcia wrote to his personnel file. Ofodile Aff. Ex. 31, at 190. There is no evidence these were coded or derogatory references to plaintiff's race. Rather, they appear to be reports of the complaints made by plaintiff's fellow teachers.

Finally, it is undisputed that Ilene Brodsky, a literacy coach, oversaw the training session and asked plaintiff to do the reading from The Cay, not Principal Garcia. Plaintiff provides no evidence to support his assertion that Principal Garcia "must have approved and condoned" the use of the book. Am. Com. ¶ 28. Both Principal Garcia and AP Jaggon testified that the reading material was decided on at the regional level;

Principal Garcia was uninvolved in the selection and was unaware what book would be used.  See Andersen Decl. Ex. C, at 171-72; Ex. M, at 86.

### 2.  Disparate treatment

#### a.  November, 2004 Observation

Plaintiff alleges that on a single occasion during a classroom observation, Principal Garcia positioned her chair so that she had her back to plaintiff, something he had never experienced before.  Principal Garcia stated she sat this way because she wanted to see the students' faces and observe the way they reacted to plaintiff's teaching.  Ofodile Aff. Ex. 31, at 60.  Other than plaintiff's speculation, there is nothing in the record to indicate Principal Garcia intended her seating to be disrespectful or that she treated non-Black or non-Caribbean teachers differently: her explanation for her seating was reasonable; she gave plaintiff a positive review of his teaching; and during subsequent observations of plaintiff, she did not sit this way.  See id. at 61-67.

#### b.  2004 Parent Complaint

Plaintiff alleges that Principal Garcia failed to follow protocol when she did not call him into her office to give him an opportunity to respond immediately to a parent complaint.  However, plaintiff did not produce any written policy that required Principal Garcia to do so, nor did he establish an unwritten policy existed because he was unable to recall any occasion when Principal Garcia followed this purported protocol.  See Ofodile Aff. Ex. 31, at 70-72.

#### c.  November 2005 Observation

Plaintiff alleges that in November 2005 Principal Garcia gave plaintiff four days' notice of a classroom observation while two Hispanic teachers were given two weeks'

notice.  Plaintiff also alleged he was required to "adhere" to a ten page document for an observation, but that the Hispanic teachers were not.  However, plaintiff was unable to produce the document or even recall what it required because he "didn't bother to read all of it."  Ofodile Aff. Ex. 31, at 100.  It is undisputed that school policy required teachers to plan lessons at least five days in advance.  Andersen Decl. Ex. C, at 136; Ex. D, at 106; see also Ex. K.   Principal Garcia testified that because teachers are expected to be prepared in advance, she plans observations based on her schedule and does not always give advance notice.  Id. at 137.   Plaintiff presented no evidence that he was disadvantaged by four days' notice or by his failure to follow the ten page document.  He testified that he had, in fact, planned his lessons a week in advance, Ofodile Aff. Ex. 31, at 101, and it is undisputed that plaintiff received a "satisfactory" rating from the observation.

> d.   Internships

Plaintiff alleges that Principal Garcia undermined his ability to complete an administrative internship and assigned him less important duties than White or Hispanic interns.  It is undisputed, however, that Principal Garcia recommended plaintiff for the internship, a necessary prerequisite to his participation, Andersen Decl. Ex. C, at 144; Ofodile Aff. Ex. 31, at 80, and that plaintiff successfully completed the internship under the supervision of AP Mendez.  Andersen Decl. at 161; Ofodile Aff. at 92.  Plaintiff conceded at deposition that it was entirely appropriate for an assistant principal to mentor him.  Ofodile Aff. Ex 31, at 97-98.

Moreover, when asked why he thought Principal Garcia was reluctant to allow him to do the internship at first, plaintiff testified, "I think it might have all resulted

from me having talked to my colleagues about her turning her back on me, telling me she was going to be a slave driver, my going to the union meeting and simply asking a question and other things that might have transpired. . . . I mentioned them to my colleagues and it's a small school and words get around."  Ofodile Aff. at 84.  While relevant to plaintiff's retaliation claim, none of these reasons are related to plaintiff's race, color, or national origin.

### e.   At-risk Student Assignments

In 2006, plaintiff requested assistance to help with low-performing students in his class.  Principal Garcia denied the request.  Plaintiff alleges this denial was an act of discrimination because a White teacher, James Caulfield ("Caulfield"), received a teaching assistant even though he had fewer low-performing students in his class. Principal Garcia testified that a teacher receives an assistant under two circumstances: if the number of students in the class reaches 35-40; or if the Individualized Education Plans ("IEPs") of individual students call for one.  Andersen Decl. Ex. C, at 163-66.  It is undisputed that neither circumstance applied to plaintiff.  See Ofodile Aff. Ex. 5.

### f.   Warnings and Letters to File

Plaintiff alleged he was warned on January 2, 2007 regarding the Kaplan pacing calendar and other non-Black, non-Caribbean teachers were not.  Defendants have submitted copies of letters, dated January 2, 2007, to all of the fifth grade teachers, instructing them to use the Kaplan pacing calendar.  See Andersen Decl. Ex. X.

### g.   Roll of Thunder Hear My Cry

Plaintiff alleges he alone was required to use Roll of Thunder Hear My Cry, a book that repeatedly uses the racial epithet "nigger," and that this was done to humiliate

21

him.  Principal Garcia testified books were selected and purchased at the regional level and she had no role in deciding which books would be used by teachers.  Andersen Decl. Ex. C, at 182.  In his deposition plaintiff admitted that it was the district that selected the book for use, not Principal Garcia, that he never made a complaint about the book, and that he never asked other teachers if they were required to use the book.  Ofodile Aff. Ex. 31, at 179, 180-81.  Plaintiff also testified that he did not use another assigned book, Sounder, after he was warned by another fifth grade teacher, Samnath Narine that it also contained racial epithets and "wasn't the book for us to read," demonstrating plaintiff exercised discretion in the use of assigned books.  See Ofodile Aff. Ex. 31, at 182-83.

### h.  Lunchroom Segregation

Plaintiff alleges that during the 2006-2007 school year Principal Garcia created a segregated lunchroom by scheduling plaintiff and the only other Black, Caribbean teacher, Ms. Mohammed, to a separate lunch period from their two fifth grade colleagues, who were not Black.[7]  Principal Garcia testified that she scheduled classes for lunch based on the lunch room's maximum capacity and the number of students in other grades.  Andersen Ex. C, at 184-85.  AP Jaggon testified that the fifth grade, comprised of four classes, was divided in half: two fifth grade classes lunched with the third grade and two lunched with the fourth grade.  Andersen Decl. Ex. M, at 83.

---

[7]  The Court notes that one of the fifth grade colleagues from whom plaintiff was separated, Mr. Narine, was by plaintiff's own description, "a dark-skinned Guyanese/Indian."  Am. Compl. ¶ 31.  Here, to create an inference of discrimination, plaintiff places Mr. Narine in the same category as White or Hispanic teachers.  At other times when it supports his claims, plaintiff identifies Mr. Narine as a teacher of color. See, e.g., Id. (arguing Mr. Narine's exclusion from the staff luncheon was evidence "all of the dark-skinned teachers in the fifth grade were excluded"). These self-serving variations undermine plaintiff's claims.

Therefore, plaintiff and Ms. Mohammed would have been assigned to lunch with White or Hispanic teachers from a lower grade and were not segregated.  Plaintiff was unable to rebut this testimony: at his deposition, plaintiff could not recall whether other classes were assigned to the same lunch period as he and Ms. Mohammed.  See Ofodile Aff. Ex. 31, at 186-87.

### i.   Staff Luncheon

Plaintiff alleges Principal Garcia discriminated by excluding fifth grade teachers of color from a staff luncheon in December 2006.  No rational trier of fact could find this incident was anything other than an administrative oversight.   AP Jaggon testified that the school secretary put a flier in every teacher's mailbox, announcing the lunch.  Andersen Decl. Ex. M, at 83.  AP Jaggon also included the lunch announcement in a weekly bulletin she prepared and delivered by hand to each teacher, including plaintiff.  Andersen Decl. Ex. M, at 84-85.  Plaintiff testified that all other teachers in the school attended, Ofodile Aff. Ex. 31, at 111, which would have included teachers of color.  Plaintiff also testified that he was invited to and attended other staff luncheons prior to this incident and after this incident.  Id.

### j.   Treatment of Other Teachers

As evidence of pretext, plaintiff also points to the disparate treatment of other members of staff.  Plaintiff alleges Principal Garcia caused eight Black or Caribbean teachers to be removed or leave between 2003 and 2007.[8]  However, plaintiff's

---

[8] These teachers were: (1) Ms. Bell Farmer, an Assistant Principal identified as Black and Panamanian; (2) Ms. Lacey, an Assistant Principal of color; (3) Ms. Ferron, a Guidance Counselor, identified as of color and Jamaican; (4) Ms. Roy, a Guidance Counselor identified as Jamaican; (5) Ms. Khan, a teacher identified as Indian and Guyanese; (6) Ms. Marerro, identified as Indian and Trinidadian; (7) Ms. Mohammed, identified as Black and Caribbean; and (8) plaintiff.  Ofodile Aff. Ex. 31 at 190-95; Andersen Decl. Ex. RRR, at 139.

allegations are undermined by a partially hand-written staffing chart he submitted.  <u>See</u> Ofodile Ex. 28.  As far as the Court can discern, plaintiff shows 25 White or Hispanic teachers also were removed or left during the same period.  Plaintiff's allegations are also undermined by Principal Garcia's hiring and promotion of AP Jaggon, who was Black and Caribbean, Assistant Principal Leatrice Johnson, who was Black, <u>see</u> Andersen Decl. Ex. C, at 82; Declaration of Robert Parlato dated July 19, 2010 ("Parlato Decl.") at 2, and two Black substitute teachers.  <u>See</u> Parlato Decl. at 2; Pl.'s Mem. at 32 n.3.

Plaintiff also submitted as evidence OEO complaints against Principal Garcia from Ms. Mohammed, who was Black and Caribbean, and Asher Marrero, who was Indian and Caribbean.  <u>See</u> <u>id.</u> Ex 29, 30, & 31, at 194. These unsworn statements are inadmissible in opposition to a summary judgment motion and Ms. Marrero's complaint does not support plaintiff's claim, consisting, as it does, of a single page that fails to specify the nature of her complaint.  Although the Court may take judicial notice of the fact Ms. Mohammed made a complaint of racial discrimination, this fact alone is not sufficient to demonstrate that defendants' reasons for suspending plaintiff from teaching are pretextual.

Having reviewed the evidence in the light most favorable to the plaintiff, the Court finds that defendants have successfully rebutted plaintiff's prima facie case and provided legitimate, non-discriminatory reasons for plaintiff's suspension.  Plaintiff has failed to present evidence that his suspension was motivated by his race, color, or national origin.  Because there is no genuine issue for trial, summary judgment must be

granted to all defendants on plaintiff's Title VII, § 1981, and NYSHRL discrimination claims.

## IV.    Plaintiff's Discrimination Claim Pursuant to NYCHRL

NYCHRL claims must be considered separately from federal and state law discrimination claims.  Vargas v. Morgan Stanley, 438 F. App'x 7, 10 (2d Cir. 2011). Previously, courts interpreted the NYCHRL as coextensive with Title VII and the NYSHRL.  The New York City Council rejected such equivalents by passing the Local Civil Rights Restoration Act of 2005.  Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 277–79 (2d Cir. 2009) (explaining the 2005 Act "abolish[ed] 'parallelism' between the [NYCHRL] and federal and state anti-discrimination law").

To state a discrimination claim under NYCHRL, plaintiff need not show that an employment action was materially adverse; any manner of discrimination is prohibited. See Margherita v. FedEx Exp., No. 07 Civ. 4826 (NG) (RER), 2011 WL 5024577, at *8 (E.D.N.Y. Oct, 20, 2011).  Nevertheless, a plaintiff must still link the adverse employment action to a discriminatory motivation and where a plaintiff fails to do so, his claims fail.  Id.  For the reasons discussed above, plaintiff has failed to make such a link and plaintiff's NYCHRL claim must also be dismissed.

## V.    Hostile Work Environment

### A.  Legal Standard for a Hostile Work Environment Claim under Title VII, § 1981 and NYSHRL

To survive a summary judgment motion on a hostile work environment claim, "[p]laintiff must introduce evidence showing that his workplace was permeated with discriminatory intimidation, ridicule, and insult, which was sufficiently severe or

<u>pervasive</u> to alter the conditions of the victim's employment and create an abusive work environment." <u>Davis-Bell v. Columbia Univ.</u>, No. 10 Civ. 4362 (CM), 2012 WL 946680, at *14 (S.D.N.Y. Mar. 19, 2012) (emphasis in original) (quotation and citations omitted). Hostile work environment claims under Title VII, § 1981, and NYSHRL are all analyzed using the same standard. <u>See</u> <u>Citroner v. Progressive Cas. Ins. Co.</u>, 208 F. Supp. 2d 328, 339 (E.D.N.Y. 2002) (citations omitted).

In order to prove that a workplace is "hostile," a plaintiff must demonstrate that: "(1) he subjectively perceive[d] the environment to be abusive; (2) the conduct alleged objectively created an environment that a reasonable person would find hostile or abusive; and (3) that the work environment was abusive to employees <u>because of</u> their race, gender, religion, or national origin." <u>Cunningham v. N.Y.S. Dep't of Labor</u>, 326 F. App'x 617, 620 (2d Cir. 2009) (quotation and citation omitted). A work environment's hostility is assessed based on the totality of the circumstances. <u>Harris</u>, 510 U.S. at 23.

## B. Legal Standard for a Hostile Work Environment Claim Under the NYCHRL

For the reasons discussed above, NYCHRL claims must be considered separately and have a more liberal pleading standard. A NYCHRL hostile work environment claim need not meet the "severe or pervasive" threshold to be actionable. <u>Williams v. N. Y. City Hous. Auth.</u>, 61 A.D.3d 62, 75-80, 872 N.Y.S.2d 27 (1st Dep't 2009). Instead, the relevant consideration is whether there is a triable issue of fact as to whether the plaintiff "has been treated less well than other employees," because of his race or national origin. <u>Id.</u> at 78.

26

### C.  Plaintiff's Hostile Work Environment Claim Fails

Plaintiff's claims fail because he has not shown he suffered any mistreatment because of his race or national origin, a necessary element under both standards. Plaintiff's hostile work environment claims are premised on the same allegations as his discrimination claims.  For the reasons discussed previously, defendants have presented legitimate reasons for each act of alleged discrimination.  Plaintiff has failed to present any evidence that would permit a rational jury to find these legitimate reasons were a pretext for discrimination based on plaintiff's race, color, or national origin.  Moreover—even if true—the disparaging comments and gestures allegedly made by Principal Garcia and others were neither severe nor pervasive enough to constitute a hostile work environment.  "For 'racist comments, slurs, and jokes' to be actionable as a hostile work environment, there generally 'must be more than a few isolated incidents of racial enmity.'" Davis-Bell, 2012 WL 946680, at *19 (quoting Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997)).  The NYCHRL, like Title VII and the NYSHRL, is not a "'general civility code,'" and "petty slights and trivial inconveniences" are not actionable. Campbell v. Cellco P'ship, 10 Civ. 9168 (SAS), 2012 WL 400959, *8 (S.D.N.Y. Feb. 7, 2012) (quoting Williams, 872 N.Y.S.2d at 38, 40).

### VI.    Retaliation

Plaintiff has also alleged that defendants retaliated against him in violation of Title VII, § 1981, the NYSHRL, and NYCHRL after plaintiff complained of discrimination and a hostile work environment.[9]  The Court's grant of summary

---

[9] Retaliation claims under Title VII, § 1981, and the NYSHRL are governed by the same standards.  See Carmody v. Vill. of Rockville Ctr., 661 F. Supp. 2d 299, 324 (E.D.N.Y. 2009) (citations omitted).  The

judgment on plaintiff's discrimination claim is not dispositive of plaintiff's retaliation

claim.  "It is well-established that a 'plaintiff may prevail on a claim for retaliation even

when the underlying conduct complained of was not in fact unlawful so long as he can

establish that he possessed a good faith, reasonable belief that the underlying challenged

actions of the employer violated [the] law.'"  <u>La Grande v. De Crescente Dist. Co., Inc.</u>,

370 F. App'x 206, 212 (2d Cir. 2010) (quoting <u>Treglia v. Town of Manlius</u>, 313 F.3d 713,

719 (2d Cir.2002)).  Although plaintiff has not carried his burden of proof on his

discrimination claims at summary judgment, defendants present no evidence that his

OEO or EEOC complaints were made in bad faith.

Retaliation claims, like discrimination claims, are subject to the <u>McDonnell</u>

<u>Douglas</u> burden-shifting analysis.  To make out a prima facie case of retaliation, a

plaintiff must show: "(1) participation in a protected activity; (2) that the defendant

knew of the protected activity; (3) an adverse employment action; and (4) a causal

connection between the protected activity and the adverse employment action."  <u>Jute v.</u>

<u>Hamilton Sundstrand Corp.</u>, 420 F.3d 166, 173 (2d Cir. 2005) (quotation omitted).

Plaintiff has sufficiently demonstrated the first three elements of a prima facie

case:  OEO and EEOC complaints are protected activity, <u>see</u> <u>Russel v. Cnty. Of Nassau</u>,

696 F. Supp. 2d 213, 236-37 (E.D.N.Y. 2010) (discussing activities that qualify as

"protected activity"); it is undisputed that defendants knew of plaintiff's complaints; and

plaintiff's suspension was an adverse employment action.  Plaintiff has also sufficiently

shown a causal connection between his complaints and his suspension.  Among other

things, causation may be proved "indirectly, by showing that the protected activity was

---

NYCHRL is broader than Title VII in some respects but because summary judgment is denied under the
more stringent Title VII standard, it is unnecessary to independently review plaintiff's NYCHRL claim.

followed closely by discriminatory treatment, or through other circumstantial evidence .

. . ." Raniola v. Bratton, 243 F.3d 610, 625 (2d Cir. 2001) (quotation omitted).

Here, plaintiff filed complaints with the OEO and EEOC on December 27, 2006 and February 7, 2007, respectively.  Prior to those complaints, plaintiff received uniformly satisfactory teaching observation reviews and positive annual performance reviews at P.S. 65 and at the schools where he previously worked.  See Ofodile Aff. Ex. 31, at 34-37, 39-41, 48.  Following his complaints, plaintiff received what can only be considered a barrage of negative performance reviews and disciplinary letters to his personnel file: between January 2007 and his suspension on June 27, 2007, plaintiff received more than twenty negative performance evaluations and disciplinary letters, sometimes as many as two per day.  See infra note 3.  Among other things, plaintiff received the first "unsatisfactory" review of his teaching only two weeks after filing his EEOC complaint.  The closeness in time between plaintiff's protected activities and the initiation of negative reviews and letters that formed the basis for disciplinary action is suggestive of retaliatory motive and sufficient to meet the de minimis threshold for a prima facie case.  See, e.g., Cayemittes v. City of New York Dep't of Hous. Pres. and Dev., No. 10 Civ. 8486 (GBD) (THK), 2012 WL 406915, at*4-5 (S.D.N.Y. 2012) (retaliation inferred where one month after protected activity, employer began filing negative documents to support demotion two months later); Fowler v. N.Y. Transit Auth., No. 96 Civ. 6796 (JGK), 2001 WL 83228, *7 (S.D.N.Y. Jan. 31, 2001) (retaliation strongly inferred where the day after plaintiff complained of discrimination, employer initiated a series of minor actions which in the aggregate constituted an adverse employment action"); see also Flood v. UBS Global Asset Mgmt., Inc., No. 10 Civ. 374 (RJH), 2012

WL 288041, at *17 (S.D.N.Y. Feb. 1, 2012) (collecting cases and nothing although there is no "bright line" rule, courts in this Circuit generally consider a delay between the plaintiff's protected action and the employer's adverse employment action of six weeks or less to permit an inference of retaliation and a delay of two months or more to counsel against one).

Defendants' proffered legitimate justification is the same as that given for plaintiff's discrimination claim: disciplinary charges were brought and plaintiff was suspended because he "rendered incompetent and inefficient service, was insubordinate, engaged in misconduct and neglected his duties . . . ."  Andersen Decl. Ex. UU.  Defendants argue that "discussions and letters concerning plaintiff's unsatisfactory performance began well in advance of his first discrimination complaint filed on December 27, 2006."  Defs.' Reply at 7.  Defendants also contend that "negative assessments of plaintiff's performance that occurred after he complained of discrimination were in fact consistent with previously expressed concerns about his teaching," negating any inference of retaliation.  Defs.' Mem. at 15.  In support of this argument, defendants cite to Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87 (2d Cir. 2001).  There, the court affirmed dismissal of a retaliation claim where the plaintiff had been subjected to "an extensive period of progressive discipline" prior to his protected activity, including diminished job responsibilities five months prior.  The court concluded that "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."  Id. at 95.

Contrary to defendants' arguments, plaintiff was not subject to a comparable "extensive period of progressive discipline."  Prior to his complaints, plaintiff had received two warnings in three years of teaching: one March 1, 2006 regarding a single inadequate lesson plan and one October 24, 2006 regarding a single instance of leaving students unsupervised.  See Andersen Decl. Ex. L & W.  He had also received some constructive criticism regarding his math teaching from the Math Coach, Jaggon. See id. Ex. M & O.  After his first complaint both the quantity and tenor of warnings and disciplinary letters changed significantly.  Plaintiff was reprimanded for repeatedly teaching below grade level, failing to follow the regional pacing calendar and the assigned curriculum, refusing to respond to directives, was required to submit all of his lesson plans in advance each week for review, and was frequently warned he was in danger of being ranked "unsatisfactory."  These accusations were considerably more critical and serious than the prior isolated incidents.

Prior to plaintiff's complaint, in February 2005, Principal Garcia wrote a glowing recommendation for plaintiff, praising him as "open and congenial," "a bright, competent and caring teacher" who "sets a positive tone which makes learning enjoyable to his students."  She wrote he, "openly accepts constructive feedback and is a joy to supervise."  Ofodile Aff. Ex. 3; see also Ex. 33, at 19 (testimony of Principal Garcia affirming the truth of her recommendation).  Following his complaint, plaintiff was repeatedly warned for failing to respond to constructive criticism, for insubordination, failure to follow instructions, and unprofessional and harassing behavior.

Prior to plaintiff's complaint during the 2004-2005 school year, Principal Garcia ranked plaintiff "satisfactory" or "up to standards" in every category, providing positive

feedback and advice.  See Andersen Decl. Ex E, F, & G.  In 2005-2006, AP Mendez's reviews were similarly positive.  See id. Ex. H, I, & J.  And in the first half of the 2006-2007 school year, AP Mendez and AP Jaggon's observations were satisfactory, providing minimal recommendations for improvement.  See Ex. Q & R.  Principal Garcia signed and approved both observations.  But after plaintiff's complaints, Principal Garcia personally conducted a third observation on March 23, 2007, finding plaintiff unsatisfactory in multiple respects and extensively criticizing his teaching.  See Andersen Ex. S.  At his 2007 annual review, plaintiff was found "unsatisfactory" in every category other than personal appearance and the cleanliness of his classroom.  Id. Ex. TT.  Although plaintiff missed only 5 days of school—less than the prior year and the same number as in his first year of teaching—his attendance was now ranked "unsatisfactory."  Ex. TT.

Finally, in December 2006, plaintiff and his union representative reviewed his personnel file and requested copies of a number of documents.  Ofodile Aff. Ex. 31, at 106.  When he received the copies, a letter of recommendation and other documents related to plaintiff's internship were missing and Principal Garcia told his union representative she had shredded them.  See Ofodile Aff. Ex. 8; Ex. 31, at 107-08.  Principal Garcia testified that plaintiff's letter of recommendation did not belong in his personnel file.  Andersen Decl. Ex. C, at 189.  Regardless of whether it belonged in his official file, the Court can think of no legitimate reason Principal Garcia would destroy a document, knowing plaintiff had requested a copy.  A jury might reasonably infer that she either wished to conceal her prior positive recommendation of plaintiff's teaching

or, as plaintiff alleges, that she wished to undermine plaintiff's ability to pursue an administrative position.

Plaintiff has presented sufficient evidence to raise a material issue of fact: whether, as plaintiff alleges, trivial oversights were excessively punished and disciplinary incidents fabricated in order to retaliate against him for his complaints, or, as defendants contend, plaintiff became increasingly erratic, insubordinate, and unsatisfactory in his teaching, necessitating his suspension.  In light of the foregoing, summary judgment is not appropriate on plaintiff's Title VII, § 1981, NYSHRL, and NYCHRL retaliation claims.

## VII. Plaintiff's Remaining Claims Against the City of New York Must be Dismissed

Defendants move to dismiss NYC as a defendant because NYC and DOE are distinct legal entities and NYC cannot be held liable for the actions of the DOE or its employees.  The DOE is "for all purposes, the government or public employer of all persons appointed or assigned by the city board or the community districts." N.Y. Educ. Law. § 2590–g(2) (McKinney 2003).   It is well-established that as a result of Education Law § 2590–g(2), the Board and the City are considered "separate and distinct entities." Campbell v. City of New York, 611 N.Y.S.2d 248, 249 (2d Dep't 1994) (citation omitted); see also Marrero v. City of New York, No. 02 Civ. 6634 (DLC), 2004 WL 444548, at *2 (S.D.N.Y. Mar. 10, 2004) (collecting cases).  NYC, therefore, is not liable for torts committed by the DOE.  Accordingly, plaintiff's remaining claims against NYC are dismissed with prejudice.

## VIII.   Plaintiff's Remaining Title VII Claims Against the Individual Defendants Must be Dismissed

Plaintiff seeks to hold Principal Garcia and Superintendent Rodriguez-Torres individually liable for discrimination, a hostile work environment, and retaliation under Title VII.  It is well-settled that there is no individual liability under Title VII.  Lore v. City of Syracuse, 670 F.3d 127, 2012 (2d Cir. 2012) ("Title VII does not impose liability on individuals.") (citations omitted).  Therefore, plaintiff's Title VII claims against Principal Garcia and Superintendent Rodriguez-Torres must be dismissed with prejudice.

## IX.   Plaintiff's § 1981 Claim Against DOE is Dismissed With Prejudice

Defendants argue plaintiff's § 1981 claims against the DOE must be dismissed because plaintiff has not pleaded or proved that his constitutional rights were violated as the result of an official policy, custom, or practice of the municipal defendant.  Defs.' Mem. at 27.  Instead, plaintiff seeks to hold DOE accountable "under the common law principal agent / respondeat superior rule."  Am. Compl. ¶ 11.

In making this argument, defendants apparently assume that plaintiff may bring a § 1981 claim against the DOE.  In fact, it is well-established in the Second Circuit that § 1981 claims cannot be brought against municipalities or municipal agencies.  See Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 109 S. Ct. 2702, 105 L. Ed. 2d 598 (1989).  "Section 1981 does not and cannot, within constitutional bounds, impose vicarious liability on municipalities; as such, Section 1981 liability against such entities can be asserted only pursuant to 42 U.S.C. § 1983 ("Section 1983"), and even then only in accordance with the well-established requirements promulgated in Monell v. N.Y.C.

34

Dep't of Soc. Services, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)." Payne v. N.Y. City Police Dep't, No. 08 Civ. o3993 (RMM) (RLM), 2012 WL 1039455, at *16 (E.D.N.Y. Mar. 28, 2012) (citations omitted); see also Philippeaux v. N. Central Bronx Hosp., 871 F. Supp. 640, 654-56 (S.D.N.Y. 1994) (discussing Jett and its continuing validity after the Civil Rights Act of 1991).

Plaintiff's Amended Complaint asserts the elements of a § 1981 claim and fails to assert an express cause of action under § 1983 or plead the relevant elements under Monell. For the reasons set forth above, his § 1981 claim against DOE must be dismissed with prejudice.

## X.   Principal Garcia is Not Entitled to Qualified Immunity

Defendants argue that Principal Garcia is entitled to qualified immunity under § 1981. See Defs.' Mem. at 29. Government officers are entitled to qualified immunity if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). On the other hand, as described by Judge Learned Hand, "It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause . . . ." Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir.1949). "The compromise between remedy and immunity . . . turns critically upon notice. Public officials sued in their individual capacity are entitled to qualified immunity from suit unless the contours of the right are sufficiently clear that a reasonable official would understand that what

he is doing violates that right." Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 129 (2d Cir. 2004).

When making this determination, the Court considers two questions: first, whether, construing the facts in favor of the non-moving party, there is a violation of a constitutionally protected right; and second, whether, considering the facts of the case before it, that right was clearly established at the time of the incident. See Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808, 813, 815–16 (2009) (setting forth qualified immunity test and holding that a court need not consider the questions in that order). To evaluate whether a right is clearly established, the Court must determine whether it would be clear to a reasonable principal that her conduct in these circumstances was unlawful. See Saucier v. Katz, 533 U.S. 194, 202, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).

There can be no doubt that it was well-established prior to 2007 that suspending an employee in response to a good-faith complaint of discrimination is unlawful and "it can never be objectively reasonable for a governmental official to act with the intent that is prohibited by law." Back, 365 F.3d at 128-30.  For the reasons set forth above, a reasonable jury could find that defendants suspended Phillip in retaliation for his OEO and EEOC complaints.  Therefore qualified immunity does not shield the alleged actions of Principal Garcia and summary judgment on this basis is denied.

## XI.  Failure to Serve Superintendent Rodriguez-Torres

In their memorandum of law, defendants request the Court dismiss sua sponte all claims against Superintendent Rodriguez-Torres for failure of service pursuant to Federal Rule of Civil Procedure Rule 4(m).  A review of the record in this case indicates

that Superintendent Rodriguez-Torres never responded to the Complaint or Amended Complaint, although she has been deposed.  Before dismissing an action sua sponte for failure to timely serve a defendant, the Court must provide notice to the plaintiff, Nagy v. Dwyer, 507 F.3d 161, 164 (2d Cir. 2007), and plaintiff bears the burden of proving service was valid and timely, Moultry v. City of Poughkeepsie, 154 F. Supp. 2d 809, 812 (S.D.N.Y. 2001).  Plaintiff is therefore ordered to show cause why all claims against Superintendent Rodriguez-Torres should not be dismissed.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted as to plaintiff's discrimination and hostile workplace claims against all defendants.  As to plaintiff's remaining retaliation claims: (1) all retaliation claims against NYC are dismissed with prejudice; (2) plaintiff's Title VII retaliation claim against Principal Garcia and Superintendent Rodriguez-Torres is dismissed with prejudice; (3) plaintiff's § 1981 Claim against DOE is dismissed with prejudice; and (4) plaintiff is ordered to show cause on or before May 3, 2012 why all claims against Superintendent Rodriguez-Torres should not be dismissed.

**SO ORDERED.**

Dated:        Brooklyn, New York
              April 19, 2012


                                        ____/s/_____
                                        I. Leo Glasser
                                        United States District Judge